DON MEDOW MOTORS,
INC., Petitioner,

v.

INDIANA STATE BOARD OF TAX
COMMISSIONERS, Respondent.

No. 71T05–8811–TA–00071.

Tax Court of Indiana.

Oct. 19, 1989.

Bruce J. Bondurant, South Bend, for petitioner.

Linley E. Pearson, Atty. Gen. by Marilyn S. Meighen, Deputy Atty. Gen., Indianapolis, for respondent.

FISHER, Judge.

## FACTS

Don Medow Motors, Inc. is an Indiana corporation in the business of selling new and used automobiles. Medow timely filed its Business Tangible Personal Property Return (Form 103) with the Portage Township Assessor, St. Joseph County. On this return Medow self-assessed its personal property as of March 1, 1985 and claimed abnormal obsolescence deductions for various vehicles. The Indiana State Board of Tax Commissioners issued its Final Assessment Determination on September 30, 1986. The Board assessed Medow for $490,060 and disallowed the deductions for abnormal obsolescence.

Medow appealed the Board's final determination to this court. This court determined that the Board had based its final determination on the wrong regulation and remanded the case to the Board for a determination of Medow's entitlement to the abnormal obsolescence adjustment under 50 IAC 4.1–3–9. *See Don Meadows Motors,*

*Inc. v. State Bd. of Tax Comm'rs* (1988), Ind. Tax, 518 N.E.2d 507.[1]

On remand, additional hearings were conducted by the Board and on August 24, 1988, the Board issued its Final Assessment Determination. The Board's final determination assessed Medow's business personal property as of March 1, 1985 to be $487,060. The decrease in assessed value from the 1986 final determination was caused by an allowance for those cars sold at a loss by Medow. The Board denied Medow's claim for abnormal obsolescence based upon 50 IAC 4.1–3–9.

Medow appeals the 1988 final determination contending that it is not supported by substantial evidence, is arbitrary and capricious and constitutes an abuse of discretion.

## ISSUE

■ The issue in this case is whether, pursuant to 50 IAC 4.1–3–9, Medow is entitled to an adjustment for abnormal obsolescence in determining the true cash value of its inventory for the tax year 1985. The applicable regulation provides in pertinent part:

> A taxpayer may claim an adjustment for abnormal obsolescence as defined in Section 1 of Rule 7 [50 IAC 4.1–7–1] of this regulation on inventory ...
>
> (B) Eligibility—The adjustment requested for abnormal obsolescence, as herein defined, will be allowed providing a taxpayer can substantiate that he has incurred abnormal obsolescence which has not as of the assessment date been recorded on his regular books and records. The term "abnormal obsolescence" will be strictly construed and be limited to a situation where unforeseen changes in values as a result of exceptional technological obsolescence or destruction by catastrophe occur, providing that such events have a direct effect on the value of the inventory of the taxpayer at the

tax situs in question on a going concern basis.

50 IAC 4.1–3–9.

## DISCUSSION AND DECISION

The Board contends, and this Court agrees, that this regulation establishes three criteria that must be met by Medow in order to receive an adjustment for abnormal obsolescence:

1. There must be a change in value of the inventory;
2. The change in value must be unforeseen; and
3. The unforeseen change in value must be the result of exceptional technological obsolescence or destruction by catastrophe.

The Board concludes that Medow fails to meet any of these criteria.

The Board's final determination will stand unless from the evidence, the court finds that the Board's final determination is unsupported by substantial evidence, an abuse of discretion, contrary to law, or arbitrary and capricious. In addition, the court may only review the evidence which was submitted to the Board at the administrative hearing. *State Bd. of Tax Comm'rs v. Gatling Gun Club, Inc.* (1981), Ind App., 420 N.E.2d 1324; *Meridian Hills Country Club v. State Bd. of Tax Comm'rs* (1987), Ind. Tax, 512 N.E.2d 911.

■ In the case at bar there is some contradiction as to exactly what evidence was presented to the Board at the administrative hearing. The Board, in its written findings, states Medow's contentions as follows:

> A. Due to a sales downturn of Renault vehicles resulting from substantial overpricing, adverse publicity concerning the AMC/Jeep Cherokee, and the virtual inactivity of the AMC Eagle line, the Taxpayer contends that it has suffered an economic hardship due to excess and overpriced inventory and therefore claimed an economic hard-

1. ·Despite the difference in names, the petitioner is the same company as the petitioner in the case at bar. The correct spelling of the petition- er's name is as it appears throughout this opinion, Don Medow Motors, Inc.

ship adjustment on 39 vehicles in the amount of $341,188 (at cost);

B. Also, due to consumer demand for larger vehicles, the Taxpayer's inventory of subcompact Pontiac vehicles was excessive. The Taxpayer claimed an economic hardship adjustment on 10 vehicles in the amount of $85,262 (at cost); and,

C. Special financing programs by both AMC and Pontiac evidence an overpricing in the base vehicle costs. Consequently, a reduction in inventory value is claimed to reduce inventory value by the average benefit of this financing feature as it applies to the models covered under these plans. An adjustment in the amount of $34,873 (at cost) was therefore claimed.

Written findings at 2, Hearing No. 85–716–731R (Aug. 5, 1988).

Medow, however, contends that the reason for its excessive inventory is as follows:

a. The Renault Alliance experienced significant mechanical problems related to the overheating of its engines. Expensive engine repair work was necessary to repair the damaged engines caused by the overheating.

b. The Jeep CJs lacked stability and were prone to rolling over. This technological problem resulted in 1.5 billion dollars in claims filed against American Motors Corporation. The adverse publicity caused Jeep sales to deteriorate and resulted in an overstocked position of the Jeep Cherokees.

c. The AMC Eagle, a type of station wagon, had an outmoded design based on the 1970 Sport Wagon. Such design was obsolete as of the assessment date, March 1, 1985.

d. The Pontiac Sunbirds and Fieros became technologically obsolete because of the reduction in gasoline prices and the public's resulting demand for larger vehicles. Additionally, the Sunbirds experienced head gasket problems, while the Fieros' engines tended to catch on fire.

Brief for Petitioner at 2.

The Board suggests that this evidence regarding mechanical problems, such as overheating, engine fires, and head gasket problems, was not presented to the Board at the administrative hearing. But assuming *arguendo* that it was presented, the Board contends that Medow still does not fall within the three criteria set out in 50 IAC 4.1–3–9. This court agrees.

Assuming, without deciding, that there was a change in value of the inventory and that the change in value was unforeseen, the issue becomes whether the unforeseen change in value was the result of "exceptional technological obsolescence or destruction by catastrophe."

Medow does not assert that there has been any destruction by catastrophe, but rather contends that its excessive inventory was due to overpricing, adverse publicity, and consumer demand for larger vehicles. These reasons, Medow contends, can be considered to be exceptional technological obsolescence. Medow fails to cite to any supporting authority and, consequently, this contention is difficult to accept.

■ The Board relies on the dictionary's definition of "obsolescence", as well as the dictionary's definition of "exceptional" and "technological." The word "obsolescence" is defined in the dictionary as:

1. a. the process of becoming obsolete or the condition of being nearly obsolete;

   b. the process of becoming or condition of being vestigial or nonfunctional.

2. a factor included in depreciation to cover the decline in value of fixed assets due to invention of new and better processes or machines, changes in demand, in design, or in the art, and other technical or legal changes but not to cover physical deterioration.

*Webster's Third New International Dictionary* at 1558 (1981 ed.).

In order to clarify the meaning of "obsolescence", it is helpful to look to the federal treatment of the obsolescence deduction for federal tax purposes. Under federal law, obsolescence is the process of becom-

ing obsolete, and obsolete means no longer in use. *Bradley v. Commissioner of Internal Revenue* (7th Cir.1950), 184 F.2d 860. Obsolescence has occurred when the property possesses value solely as salvage or scrap. *State Line and Sullivan R. Co. v. Phillips* (3d Cir.1938), 98 F.2d 651. The intent behind the obsolescence deduction has been explained as follows:

> When it was found that the process of wearing out or using up of the property was accelerated or that for some reason it had become outmoded and that the depreciation would not be sufficient, Congress granted further relief for this period when the property was becoming obsolete, and named this special privilege a deduction for obsolescence.

*Southeastern Bldg. Corp. v. Commissioner of Internal Revenue* (5th Cir. 1945), 148 F.2d 879, 880.

In *Southeastern,* the court also stated that "[t]he unprofitable nature of a business or the mere shrinkage in value of commodities is not a sufficient basis upon which to predicate an allowance for obsolescence." *Id.* at 880.

In *State Line, supra,* the railroad company (State Line) claimed a deduction for obsolescence based on economic conditions which resulted from changes in the physical resources of the mining properties adjacent to the railroad line and also the construction of a highway which drained traffic from the railroad. The court rejected State Line's contentions. The court pointed to evidence which showed that a year's lease was offered to State Line and the railway was still in use. Thus, the railway still had substantial commercial value at the time of the claim for obsolescence.

Although the federal case law is not controlling on the case at bar, it shows that obsolescence is more than just a change in the value of property. Obsolescence denotes the end of a useful life or the total loss of value.

Medow has not supported its assertions that the vehicles were, or were in the process of becoming, obsolete. Moreover, Medow has not shown that the alleged obsolescence was the result of anything "exceptional" or "technological."

Specifically, Medow has failed to prove that the roll over problem of the Jeep CJs was a technological problem which rendered the vehicles obsolete. Medow testified that the slump in sales of these vehicles was due to adverse publicity and not because the vehicles were no longer marketable or useful. Furthermore, the Pontiac Sunbirds and Fieros did not become technologically obsolete as a result of the reduction in gasoline prices. Although the public's demand for larger vehicles may have increased with the end of the gasoline shortage, there was still a market for subcompact cars. Also, the mechanical problems of the Sunbirds, Fieros, and Alliances did not render the cars obsolete. Apparently each problem was repairable and the vehicles were sold and used for their intended purpose. All of the vehicles contested in this case were eventually sold by Medow at a profit or a break-even point.

It is understandable that Medow may have suffered an economic hardship due to the changes in market conditions, but Medow's misfortune is not without remedy. Other provisions of 50 IAC 4.1–3 [2] allow for changes in market conditions, and these options were available to Medow. The Board found that Medow was entitled to a lower of cost or market adjustment on certain units in its inventory and such an adjustment was made.

Medow has failed to support its contention that the Board's determination is not supported by substantial evidence, is arbitrary and capricious, or constitutes an abuse of discretion. Accordingly, the Board's final determination is affirmed.

---

**2.** 50 IAC 4.1–3–5 states that "a taxpayer may elect to value inventory on the prior calendar year average." 50 IAC 4.1–3–6 allows retail merchants a method of valuing inventory at the lower of cost or market.