Ronald D. CLARK, Petitioner,

v.

**STATE BOARD OF TAX COMMISSIONERS,**
Respondent.

No. 49T10–9607–TA–00083.

Tax Court of Indiana.

April 24, 1998.

Curtis J. Dickinson, David L. Pippen, Dickinson & Abel, Indianapolis, for Petitioner.

Jeffrey A. Modisett, Attorney General, Vincent S. Mirkov, Deputy Attorney General, Indianapolis, for Respondent.

FISHER, Judge.

Ronald D. Clark appeals final determinations of the State Board of Tax Commissioners (State Board) assessing two of his properties as of March 1, 1993.

## BACKGROUND AND PROCEDURAL HISTORY

Clark owns two neighboring apartment buildings, one located at 201 South Salisbury Street (Salisbury Property) and the other located at 121 West Wood Street (Wood Property) in West Lafayette, Indiana. The Wood and Salisbury Properties are located near Purdue University and serve a primarily student market. On October 12, 1993, Clark filed a Form 130 Petition for Review of Assessment for each apartment building with the Tippecanoe County Board of Review (BOR) challenging the apartment buildings' assessment. The BOR declined to change the assessed value of the apartment buildings. On December 9, 1993, Clark filed a Form 131 Petition for Review of Assessment for each apartment building with the State Board alleging that the BOR had given the apartment buildings an improper amount of obsolescence depreciation.[1] On May 31, 1996, the State Board issued two final determinations reducing the assessed value of the Wood and Salisbury Properties. On July 16, 1996, Clark initiated this original tax appeal, and on May 23, 1997, the parties tried this cause before this Court.

## ANALYSIS AND OPINION

### Standard of Review

■ The State Board is given great deference when it acts within the scope of its authority. Accordingly, this Court reverses final determinations of the State Board only when the decision is unsupported by substantial evidence, is arbitrary or capricious, constitutes an abuse of discretion, or exceeds statutory authority. *Sangralea Boys Fund, Inc. v. State Bd. of Tax Comm'rs,* 686 N.E.2d 954, 956 (Ind.Tax Ct.1997), *review denied.* This oft-repeated language mirrors the traditional standard by which courts evaluate the decisions of administrative agencies.[2] *See State Bd. of Tax Comm'rs v. Smith,* 463 N.E.2d 493, 495 n. 2 (Ind.Ct.App.1984) (judicial review of State Board decisions closely analogous to judicial review of administrative decisions).

■ In addition, the party challenging the propriety of a State Board final determination bears the burden of demonstrating the invalidity of that final determination. *See Zakutansky v. State Bd. of Tax Comm'rs,* 691 N.E.2d 1365, 1367 (Ind.Tax Ct. 1998); *Vonnegut v. State Bd. of Tax Comm'rs,* 672 N.E.2d 87, 89 (Ind.Tax Ct.1996), *review denied.* This Court's decisions contain various formulations of how a taxpayer may satisfy this burden. A few decisions of this Court have characterized this burden as requiring the taxpayer to make a prima facie case. *See Wareco Enters. v. State Bd. of Tax Comm'rs,* 689 N.E.2d 1299, 1300 (Ind.Tax Ct.1997); *Western Select Properties v. State Bd. of Tax Comm'rs,* 639 N.E.2d 1068, 1071 (Ind.Tax Ct.1994); *GTE N., Inc. v. State Bd. of Tax Comm'rs,* 634 N.E.2d 882, 887 (Ind.Tax Ct.1994); *Thorntown Tel. Co. v. State Bd. of Tax Comm'rs,* 629 N.E.2d 962, 964 (Ind.Tax Ct.1994). In order to establish a prima facie case, a taxpayer must introduce evidence "sufficient to establish a given fact and which if not contradicted will remain sufficient." *GTE N.,* 634 N.E.2d at 887. Once the taxpayer carries the burden of establishing a prima facie case, the burden shifts to the State Board to rebut the taxpayer's evidence and justify its decision with substantial evidence. *See Western Select Properties,* 639 N.E.2d at 1072.

Other decisions by this Court have characterized the burden of demonstrating the in-

---

1. Clark raised issues besides the obsolescence depreciation for Wood and Salisbury at the administrative level. These issues were considered by the State Board in its final determination and will be evaluated here.

2. Judicial review of an administrative decision is limited to determining whether the administration possessed jurisdiction of the subject matter, whether the administration's decision was made pursuant to proper procedures, was based upon substantial evidence, was not arbitrary or capricious, and was not in violation of any constitutional, statutory or legal principle. *Rynerson v. City of Franklin,* 669 N.E.2d 964, 971 (Ind.1996); *see also* IND CODE ANN. § 4–21.5–5–14 (West 1991); *McClain v. Review Bd. of State Dep't of Workforce Dev.,* 693 N.E.2d 1314 (Ind. 1998) (discussing judicial review of agency determinations).

validity of an assessment as requiring the taxpayer to "show [that] the State Board's assessment was inaccurate." *Paul Heuring Motors, Inc. v. State Bd. of Tax Comm'rs,* 620 N.E.2d 39, 41 (Ir d.Tax Ct.1993) (citing *Meridian Hills Country Club v. State Bd. of Tax Comm'rs,* 512 N.E.2d 911, 913 (Ind.Tax Ct.1987)). *Cf. North Park Cinemas, Inc. v. State Bd. of Tax Comm'rs,* 689 N.E.2d 765, 770 (Ind.Tax Ct.1997) (burden of proving the incorrectness of an assessment lies with taxpayer).

Other decisions have eschewed these requirements, focusing instead on whether the State Board's final determination is proper. *See, e.g., Bender v. State Bd. of Tax Comm'rs,* 676 N.E.2d 1113 (Ind.Tax Ct.1997); *Simmons v. State Bd. of Tax Comm'rs,* 642 N.E.2d 559 (Ind.Tax Ct.1994); *Harrington v. State Bd. of Tax Comm'rs,* 525 N.E.2d 360 (Ind.Tax Ct.1988). The critical inquiry in these cases is not what the taxpayer demonstrated the assessment should be, but rather whether the State Board acted properly in arriving at its final determination. *See Scheid v. State Bd. of Tax Comm'rs,* 560 N.E.2d 1283, 1285 (Ind.Tax Ct.1990) (Court concerned with "integrity of the process by which the facts were found, rather than the facts themselves"). At first glance, these cases might seem somewhat inconsistent with the cases that require the establishment of a prima facie case or that require the taxpayer to establish the inaccuracy of a particular assessment. Those cases seem to predicate a taxpayer's ability to challenge an assessment on the taxpayer affirmatively demonstrating a competing view of what the assessment should be. However, a deeper examination of the case law reveals that the differences are linked to the issues raised in each case, rather than any inconsistency in this Court's jurisprudence.

 As this Court's decisions demonstrate, there are a variety of different challenges that can be made to a final determination of the State Board. What the taxpayer must demonstrate in order to gain reversal of the final determination depends on the issues raised by the challenge. For example, when a taxpayer challenges his assessment

as violating the uniformity and equality requirement of the Indiana Constitution, in order to demonstrate the invalidity of the assessment, the taxpayer will have to bring evidence of similar properties. *See Zakutansky,* 691 N.E.2d at 1370 (by introducing assessments of comparable properties, taxpayer placed burden on State Board to explain disparity in assessments); *Western Select Properties,* 639 N.E.2d at 1075 (taxpayer must offer evidence of assessment of similar properties in order to demonstrate inconsistent assessments); *Meridian Hills Country Club,* 512 N.E.2d at 915 (where taxpayer does not bring evidence of dissimilar treatment of similar properties, claim that assessment violates uniform and equal mandate must fail). In order to successfully challenge a final determination, the taxpayer will necessarily have to offer a competing view (and evidence to support that view) of what the assessment should be. However, a taxpayer need not offer a competing view of an assessment in every case (although the taxpayer's case will undoubtedly be helped by doing so). Under this Court's standard of review, a State Board final determination must be reversed if, inter alia, that final determination is unsupported by substantial evidence. A demonstration that an assessment is not supported by substantial evidence is not necessarily predicated on demonstrating a competing view of what the assessment should be. *Cf. Bock Prods., Inc. v. State Bd. of Tax Comm'rs,* 683 N.E.2d 1368, 1371 (Ind.Tax Ct.1997) (taxpayer is not required to demonstrate how assessment error is supposed to be corrected). In other words, a taxpayer need not always challenge the accuracy of an assessment in order to challenge the basis of the assessment.[3]

 Properly understood, the term prima facie case is a convenient shorthand for describing situations where the taxpayer has chosen or is required to offer evidence of a competing view of an assessment to demonstrate the invalidity of a State Board final determination. Once the taxpayer has made the proper evidentiary showing, it is incumbent upon the State Board to offer some explanation in order to rebut the taxpayer's evidence. This requirement stems from the

---

3. *See infra* note 16.

State Board's duty not to act arbitrarily and capriciously. *See Western Select Properties,* 639 N.E.2d at 1075. The State Board may not simply refuse to consider the taxpayer's evidence. *See Conti v. Commissioner,* 39 F.3d 658, 664 (6th Cir.1994) ("[A] taxpayer's unimpeached, competent, and relevant testimony 'may not be arbitrarily discredited and disregarded....' ") (quoting *Loesch & Green Const. Co. v. Commissioner,* 211 F.2d 210, 212 (6th Cir.1954)); *Anastasato v. Commissioner,* 794 F.2d 884, 888 (3d Cir.1986) (Tax Court must consider taxpayer's evidence.); *Western Select Properties,* 639 N.E.2d. at 1075 (State Board cannot simply refuse to recognize taxpayer's evidence). The rule is simple: when a taxpayer offers probative evidence, that evidence must be dealt with in some meaningful manner. The prima facie case formulation allows this Court to determine whether the State Board did so.

## Discussion

Clark makes a variety of challenges to the assessments at issue in this case. He challenges the grade given to both properties, the amount of obsolescence depreciation given to both properties and the use of the GCM Pricing Schedule to assess the Salisbury Property. For ease of analysis, the Court will consider the Wood and Salisbury Properties separately.

### I. The Wood Property

■ a. Grade—Clark challenges the C grade given to the Wood Property. According to the regulations governing the assessments at issue, a C grade is given to a "moderately attractive building[ ] conforming with the base specifications used to develop the pricing schedule." IND.ADMIN.CODE tit. 50, r. 2.1–4–3(f) (1992) (codified in present form at *id.* r. 2.2–10–3(a)(3) (1996)). The Wood Property was assessed using the GCR Pricing Schedule for apartment buildings. IND.ADMIN.CODE tit. 50, r. 2.1–4–7(c) (1992) (codified in present form at *id.* r. 2.2–11–3 (1996)). The GCR Pricing Schedule for apartment buildings presumes the existence of concrete back-up walls and nine-foot wall height. It also presumes that 20% of the

openings in each floor are sliding glass doors. *See Wareco Enters.,* 689 N.E.2d at 1302 ("Building models establish the Base Rate and tax value of a building that is presumed to have the same interior and mechanical components as the model."). At trial, Clark proffered evidence that the Wood Property did not have these features. Clark argues that the lack of these features means that the State Board erred in giving the Wood Property a C grade.

■ Before turning to the merits of Clark's argument, the Court must determine what evidence was presented at the administrative level. As this Court's decisions make clear, a taxpayer may not base a claim of error on evidence not presented at the administrative level. *See North Park Cinemas,* 689 N.E.2d at 767–68 (citing *State Bd. of Tax Comm'rs v. Gatling Gun Club, Inc.,* 420 N.E.2d 1324 (Ind.Ct.App.1981)); *GTE N.,* 634 N.E.2d at 889 n. 7; *Don Medow Motors, Inc. v. State Bd. of Tax Comm'rs,* 545 N.E.2d 851, 852 (Ind.Tax Ct.1989); *Indiana Ass'n of Seventh–Day Adventists v. State Bd. of Tax Comm'rs,* 519 N.E.2d 772, 773 (Ind.Tax Ct.1988). This rule forces taxpayers to make their cases to the State Board, the acknowledged property tax experts. *See Castello v. State Bd. of Tax Comm'rs,* 638 N.E.2d 1362, 1365 (Ind.Tax Ct.1994). As the State Board points out in its brief, this rule holds true even where the taxpayer could have established entitlement to relief. *See Harbor Food Plaza, Inc. v. State Bd. of Tax Comm'rs,* 638 N.E.2d 898, 901 (Ind.Tax Ct.1994).

At trial, Mr. Drew Miller, a property tax consultant handling Clark's Form 131 petitions for review, testified that, with respect to the grade of the Wood Property, he discussed the lack of back-up walls with the hearing officer, Ms. Ellen Yuhan. However, Mr. Miller testified that he could not remember addressing the other allegations. (Trial Tr. at 42). Ms. Yuhan testified that the only evidence presented on the issue of the Wood Property grade was the lack of back-up walls.[4] (Trial Tr. at 71). Because the only evidence with respect to the Wood Property

---

4. At trial, Mr. Miller testified that by stating that the C grade was improper he intended to have the State Board hearing officer check the Wood Property to see if it conformed with all the base

specifications of the model. This intention does not make evidence (other than that concerning the lack of concrete back-up walls) concerning

grade presented to the State Board was the lack of concrete back-up walls, this Court will only consider that evidence.[5]

The State Board correctly points out that the determination of grade is subjective and involves a qualitative judgment on the part of the assessor. *See Reams v. State Bd. of Tax Comm'rs*, 620 N.E.2d 758 (Ind. Tax Ct.1993). This Court affords subjective determinations made by the State Board a great deal of deference, and this Court will not substitute its judgment for that of the State Board. However, the fact that a decision is committed to the State Board's subjective judgment does not mean that the decision is immune from judicial review. *See Corey v. State Bd. of Tax Comm'rs*, 674 N.E.2d 1062, 1066 (Ind.Tax Ct.1997) (subjective judgment of neighborhood desirability must be supported by substantial evidence); *Western Select Properties*, 639 N.E.2d at 1073 (State Board must provide some reasoning to support a subjective judgment).

As described above, a C grade improvement is of average quality materials and workmanship and conforms to the base specifications of the model. This, however, does not mean all improvements that lack features presumed to exist in the pricing schedule are to be given a grade other than C. A C grade

may be appropriate where the subject improvement contains other features (such as higher quality construction materials) that make up for the deviation from the base specifications used in developing the pricing schedule.[6] *Cf. Componx, Inc. v. State Bd. of Tax Comm'rs*, 683 N.E.2d 1372, 1375 (Ind. Tax Ct.1997) (where building contains features not present in model, increase in grade may be appropriate).

In this case, Clark has demonstrated that the Wood Property lacks concrete back-up walls presumed to exist in the pricing schedule used to assess the Wood Property. By doing so, Clark has made a prima facie case showing that the State Board erred in assessing the property. This places the burden on the State Board to rebut Clark's evidence and explain why the C grade was appropriate. *See Western Select Properties*, 639 N.E.2d at 1074.

The State Board has not met its burden in this case. Here, all the State Board has done is to state in conclusory fashion that the Wood Property has some other features that make up for the deviation from the base specifications and that the property must have some other structure that performs the function of the back-up wall.[7] This is insufficient to rebut Clark's prima facie case.

---

the deviation of the Wood Property from the base specifications admissible. The admissibility of evidence in this Court does not depend on what evidence the taxpayer *intended to present* at the administrative level. Rather, it depends on what evidence the taxpayer *actually presented* at the administrative level. This Court will not allow the strictures of *Gatling Gun* and IND.CODE ANN. § 33–3–5–14 (West 1996) to be circumvented. Clark chose not to call all the ways in which the Wood Property deviated from the base specifications to the attention of the State Board hearing officer; he must live with that choice in this original tax appeal.

5. The State Board argued that Mr. Miller did not have a sufficient basis (i.e., lacked the personal knowledge) for his testimony that the Wood Property lacked concrete back-up walls. *See* IND. EVID.R. 602. In support of its position, the State Board invites this Court's attention to pages 19–20 of the trial transcript. At that point in the trial, Mr. Miller was testifying about the Salisbury Property. On page 25 of the trial transcript, Mr. Miller stated unequivocally that the Wood Property did not have a concrete back-up wall. The State Board did not object to this testimony and has waived the issue of Mr. Miller's personal knowledge. *See* IND.EVID.R. 103(d).

However, even if the State Board had objected to Mr. Miller's testimony, the evidence was admissible. The record reflected that Mr. Miller visited and inspected the subject properties. That is sufficient to support a finding that Mr. Miller had personal knowledge of the lack of concrete back-up walls. *See* IND.EVID.R. 104(b).

6. A grade adjustment is not the only method of accounting for a particular improvement's deviation from the base specifications. The regulations provide for adjustments based on the presence of components not accounted for in the base specifications and adjustments based on the absence of components presumed to exist in the base specifications. *See* IND.ADMIN.CODE tit. 50, r. 2.1–4–3(b)–(e) (1992) (codified in present form at *id.* r. 2.2–10–6.1(b)–(e) (1996)); *Wareco Enters.*, 689 N.E.2d at 1302; *Bock Prods.*, 683 N.E.2d at 1371. These adjustments are more objective than a grade adjustment and should be used where possible.

7. The State Board argues that if there are no concrete back-up walls in the Wood Property, there must be something else in the building performing their function. This argument does nothing to advance the State Board's position.

But for the existence of other features to make up for the lack of the concrete back-up walls, the Wood Property would be entitled to a grade of less than C. This necessarily follows from the fact that the Wood Property lacks features presumed to exist in the base specifications. However, in this case, the State Board has asserted that other features possessed by the Wood Property such as nice brickwork, make up for that deficiency. In order for the other features to make up for the lack of concrete back-up walls so as to make C the appropriate grade for the Wood Property, those features must add to the reproduction cost[8] of the Wood Property as much as the lack of back-up walls subtract from the reproduction cost of the Wood Property.[9]

In support of its determination, the State Board offered the hearing officer's conclusion that the "pluses and minuses" of the Wood Property were at equipoise,[10] (Trial Tr. at 81) and the testimony of the hearing officer that comparable properties in the Lafayette area were given a C grade. (Trial Tr. at 105). As for the conclusion that the "pluses and minuses" were equipoised, substantial evidence, not conclusory statements, satisfies the State Board's burden.[11] *See Thorntown Tel. Co.,* 629 N.E.2d at 965 ("Unsupported conclusions or findings are insufficient to contradict a prima facie case."); *see also Talesnick v.*

First of all, assessments should not be made on the basis of unsubstantiated assumptions by State Board hearing officers. *See Simmons,* 642 N.E.2d at 560–61 n. 2. Moreover, even if there is something else performing the function of the concrete back-up wall in the building, there is no evidence to demonstrate the effect of the substitute structure on the grade of the Wood Property.

8. The term, reproduction cost, as used throughout this opinion means the reproduction cost of structures as determined by an application of the State Board regulations. *See* IND.ADMIN.CODE tit. 50, r. 2.1–4–2 (1992) (defining reproduction cost) (codified in present form at *id.* r. 2.2–2–1(c) (1996)); *Town of St. John v. State Bd. of Tax Comm'rs,* 690 N.E.2d 370, 374 (Ind.Tax Ct.1997), *petition for review filed,* Jan. 21, 1998; *Dawkins v. State Bd. of Tax Comm'rs,* 659 N.E.2d 706, 709 (Ind.Tax Ct.1995).

9. In support of the C grade given the Wood Property, the State Board argues that strict conformity with the base specifications is not required. There can be little quarrel with this argument. In most cases, buildings are unique and consequently will deviate from the base specifications to varying degrees. This does not preclude these buildings from being given a C grade. However, the State Board goes further. It argues that this Court should overlook the Wood Property's deviation from the base specifications because strict conformity with the base specifications is not required. According to the State Board, the fact that the regulations do not require strict conformity renders the deviation of no consequence. Therefore, the Wood Property was properly graded.

Aside from the fact that this argument reads the only truly objective criterion out of the C grade definition (i.e., conformity with base specifications), this argument must fail. A deviation from the model (base specifications) will almost certainly affect the reproduction cost of the building. The assessor may not cover up a deviation from the model merely by stating that the C grade definition is flexible. The flexibility allows non-conforming buildings to be assessed; it does not allow the deviations of non-conforming buildings to be ignored.

10. The State Board hearing officer testified that she did not know whether or not a concrete back-up wall existed in the Wood Property. (Trial Tr. at 76). This ignorance is mystifying in light of the fact that Clark specifically raised that issue at the administrative level, and it makes one wonder whether the C grade represented the "composite judgment" of the hearing officer or her uninformed guess. *See Corey,* 674 N.E.2d at 1066.

The hearing officer also testified that she did not know whether the Wood Property matched the base specifications in all respects. (Trial Tr. at 59–61). This is somewhat problematic because the regulations call for "careful consideration" and "sound judgment" on the part of the assessor. IND.ADMIN CODE tit. 50, r. 2.1–4–3(f) (1992) (codified in present form at *id.* r. 2.2–10–3(d) (1996)). However, State Board hearing officers do not have the duty to make a case for the taxpayer. *See North Park Cinemas,* 689 N.E.2d at 769. This rule has particular force where a taxpayer employs a property tax consultant to handle the petition for review. The State Board hearing officer in this case was entitled to presume that any specific problems with the assessment would have been brought to her attention by Mr. Miller.

11. Despite the imprecision of the various grade classification definitions, *see Town of St. John,* 690 N.E.2d at 386, this is not an insurmountable burden. *See Mahan v. State Bd. of Tax Comm'rs,* 622 N.E.2d 1058, 1064 (Ind.Tax Ct.1993) (where "buildings contained average materials and workmanship," thus indicating C grade, but lacked architectural treatment and only contained minimal built-in features, thus indicating D grade, State Board did not abuse discretion in assigning C–2 grade).

*State Bd. of Tax Comm'rs*, 693 N.E.2d 657, 661–662 (Ind.Tax Ct. 1998). There is no evidence in the record to suggest that the "minuses" of the Wood Property are compensated by the "pluses" of the Wood Property. Consequently, the hearing officer's conclusion that a C grade was appropriate for the Wood Property cannot be upheld on this basis.

As for the comparable properties, the evidence has shown that the State Board hearing officer lacks significant information concerning the characteristics of the Wood Property. She is therefore not in a position to determine whether other properties in the area are indeed comparable. Consequently, her comparison of other properties does not constitute the substantial evidence needed to support a State Board final determination. Accordingly, this issue is REMANDED to the State Board for further consideration.

■■■ **b. Obsolescence Depreciation—** Originally, the BOR awarded the Wood property no obsolescence depreciation. In its final determination, the State Board awarded the Wood Property 5% obsolescence depreciation. Clark contends that the Wood Property is entitled to more obsolescence depreciation. Clark supported his claim by providing financial statements to demonstrate allegedly excessive maintenance costs. Clark attributed the cause of the alleged excessive maintenance costs to the apartments serving a student market. Clark also pointed to the lack of an elevator, some building code violations, and an allegedly inadequate parking lot, as evidenced by a ratio of two parking spots per apartment unit coupled with the fact that some of the apartment units had more than two bedrooms.[12] (Trial Tr. at 28–29).

The regulations define obsolescence as a functional and economic loss of value. IND.ADMIN.CODE tit. 50, r. 2.1–5–1 (1992) (codified in present form at *id.* r. 2.2–10–7(e) (1996)). Functional obsolescence is caused by factors internal to the property and is "evidenced by conditions within the property." *Id.* Economic obsolescence is caused by factors external to the property. *Id.* The regulations also give a number of examples of things that might cause obsolescence, such as a poor land to building ratio (functional) and a termination of the need for the property due to changing economic or social conditions (economic). *Id.* It is important to keep in mind that the obsolescence of a given improvement must be tied to a loss of value. In the commercial context, that loss of value usually means the loss of income generated by the property. *See Simmons,* 642 N.E.2d at 560–61; *GTE N.,* 634 N.E.2d at 887.

The regulations state that an "[a]ccurate determination of Obsolescence Depreciation will require the assessor to recognize the symptoms of obsolescence and exercise sound judgement in equating his observation of the property to the correct deduction in value from Reproduction Cost New." IND.ADMIN.CODE tit. 50, r. 2.1–5–1. Under this regulation, the determination of obsolescence is a two-step inquiry. The assessor must identify the causes of obsolescence and then quantify the amount of obsolescence to be applied.

Taxpayers may therefore challenge the obsolescence depreciation awarded a particular improvement on two bases. They may argue that there were causes of obsolescence not accounted for in the State Board final determination, or they may argue that the quantification of obsolescence is not supported by substantial evidence. Clark makes both challenges to the obsolescence awarded the Wood Property.

■■■ The parties agree that the building code violations cause the Wood Property at least some degree of obsolescence. Clark presented prima facie evidence of other possible causes of obsolescence, besides the building code violations. The allegedly inadequate parking and the lack of an elevator

---

12. At trial, Clark also presented testimony that neither property complied with the Americans with Disabilities Act (ADA) in terms of access to the properties. The State Board hearing officer agreed. (Trial Tr. at 64). However, compliance with the ADA was not an issue considered at the administrative level and will not be considered here. In light of this Court's disposition of this case, it is unnecessary to consider the issue arising where the State Board admits favorable information to the taxpayer in this Court where the taxpayer did not present that information at the administrative level.

could certainly reduce the rental income that the property would otherwise receive, thereby causing economic loss.[13] *See Simmons,* 642 N.E.2d at 561 (because neighborhood may cause economic loss, it must be taken into consideration in determining obsolescence). This triggered the State Board's duty to rebut the evidence and establish a basis for its final determination. *See Thorntown Tel. Co.,* 629 N.E.2d at 965.

The Court finds that the State Board rebutted Clark's prima facie case. At trial, the State Board hearing officer testified that the Wood Property was almost fully occupied and would have an excellent tenant base due to its location near Purdue University.[14] This means that the State Board could have rationally concluded that the additional alleged causes of obsolescence did not cause the Wood Property to experience a loss in value, i.e., a loss of earning capacity. A high occupancy rate is not necessarily determinative of whether obsolescence exists because a taxpayer may have had to reduce the rent to maintain the high occupancy rate; however, it does serve to rebut a taxpayer's prima facie case and put the burden of going forward with evidence back on the taxpayer. *See GTE N.,* 634 N.E.2d at 887 (burden of

going forward with evidence may shift many times).

The Court comes to this conclusion partly for the sake of practicality. When a hearing officer inspects a rental property, the occupancy rate will be readily apparent. Upon seeing a high occupancy rate, a State Board hearing officer is entitled to presume that a large amount of economic obsolescence is not justified. The taxpayer should then come forward with evidence showing that, despite the high occupancy rate, obsolescence is justified. The taxpayer is the one who best knows his business, and it is the taxpayer who seeks to have the assessed value of his property reduced. *Cf. Rotation Prods. Corp. v. Department of State Revenue,* 690 N.E.2d 795, 798 (Ind.Tax Ct.1998). Clark has failed to come forward with evidence that would call into question the conclusion that the additional alleged causes of obsolescence did not cause the Wood Property to lose value. Consequently, Clark has failed to upset the State Board's final determination on this basis.

Clark's second challenge to the obsolescence awarded the Wood Property concerns the quantification of the obsolescence at 5%. Clark argues that the 5% figure is

13. The financial statements proffered by Clark were not considered by this Court because they did not adequately relate to obsolescence. Clark argued that the financial statements showed that the Wood Property had excessive maintenance costs due to the student tenant population. The characterization of maintenance costs as excessive implies that *they are excessive in relation to maintenance costs in other properties.* Clark did not compare the Wood Property's maintenance costs to other properties with a non-student population. Without a comparison, the State Board had no way to determine whether the Wood Property's maintenance costs were normal or excessive. Although there may be instances where financial statements, standing alone, may be probative of obsolescence, this is not one of them. Because the financial statements did not show that the Wood Property's maintenance costs were excessive, they were not probative of obsolescence. Consequently, the State Board properly refused to consider them. *Cf. Meridian Hills Country Club,* 512 N.E.2d at 914 (nonprobative evidence insufficient to sustain taxpayer's burden of demonstrating invalidity of assessment).

When asked about this at trial, Mr. Miller stated that the regulations did not give any guidance on how to prove the excessive costs, and that he would have submitted comparison prop-

erties had the regulations required the taxpayer to do so. (Trial Tr. at 46). One would think that, in cases where there is little guidance on what kinds of evidence are to be considered, prudent litigants would err on the side of offering more evidence rather than less evidence.

14. The Court notes that the State Board failed to mention the fact that the Wood Property has a high occupancy rate in its final determination. *See 20th Century Fiberglass v. State Bd. of Tax Comm'rs,* 683 N.E.2d 1376, 1377 (Ind.Tax Ct.1997). On the obsolescence issue, the final determination states, "Review of the evidence and visual inspection determines 5% obsolescence be applied. The interior bedrooms with no outside access violate fire regulations." (Joint Ex. 1 at 12). From the final determination, it is impossible to tell whether the occupancy rate factored into the decision to discount Clark's prima facie showing of other possible causes of obsolescence. Therefore, it is impossible to determine whether the reference to the occupancy rate was a post hoc rationalization (i.e., a reason offered after the decision in support of that decision) or part and parcel of the final determination. Fortunately, this Court need not resolve this issue because Clark does not argue this point.

not supported by substantial evidence. The regulations contain no specific guidance on how the obsolescence of a given improvement is to be quantified. However, the fact that the regulations provide no guidance in arriving at a specific figure does not mean that the State Board is absolved of its responsibility to support its quantification of obsolescence with substantial evidence. *See Thorntown Tel. Co.*, 629 N.E.2d at 966 (complexity involved in calculating economic obsolescence makes it "imperative" that State Board give "authoritative explanation" for economic obsolescence). The State Board is required to make findings "sufficient to inform the parties of the evidentiary bases upon which the ultimate findings rest." *Id.* at 965 (quoting *Hale v. Review Bd. of Ind. Employment Sec. Div.*, 454 N.E.2d 882, 885 (Ind.Ct.App.1983)). This facilitates judicial review and protects due process rights. *See id.* at 965–66. *See also Corey*, 674 N.E.2d at 1066 (The court must be sufficiently apprised of the basis of a State Board final determination so that it may properly review final determination.); *Bailey Seed Farms v. State Bd. of Tax Comm'rs*, 542 N.E.2d 1389, 1392 (Ind.Tax Ct.1989) ("[C]ourt cannot properly review a determination unless it is apprised of the basis of the determination").

The State Board hearing officer testified that she gave the Wood Property a 5% obsolescence depreciation because of certain fire code violations. (Trial Tr. at 61). When asked by counsel at trial to explain the basis of her determination for 5% obsolescence as opposed to 6% or 10%, the State Board hearing officer stated, "There's really nowhere in the manual that says you give this amount for that. I mean it's at your discretion." (Trial Tr. at 62). A reference to the discretion of a State Board hearing officer hardly establishes a substantial evidentiary basis for

the decision to quantify the obsolescence depreciation of the Wood Property at 5%.[15] *See Talesnick*, 693 N.E.2d at 661 ("The State Board must do more than merely assert that it valued the property correctly."); *Thorntown Tel. Co.*, 629 N.E.2d at 965. This Court has rejected similar attempts by State Board hearing officers to explain how they arrived at a specific amount of obsolescence depreciation. *See Western Select Properties*, 639 N.E.2d at 1073 (remanding case to State Board where hearing officer could not articulate why he chose 75% obsolescence over 95% obsolescence); *see also Canal Square Limited Partnership v. State Bd. of Tax Comm'rs*, 694 N.E.2d 801 (Ind.Tax Ct. 1998).

The State Board's final determination also fails to provide the necessary support for the quantification of the Wood Property's obsolescence: "Review of the evidence and visual inspection determines that 5% obsolescence be applied." (Joint Ex. 1 at 12). This "explanation" fails to articulate in any manner how the cause of obsolescence (i.e., the building code violations) equates "to the correct deduction in value from Reproduction Cost New." IND.ADMIN.CODE tit. 50, r. 2.1–5–1. There is not even a scintilla of evidence in the record to support the quantification of obsolescence at 5%.[16] *See Bailey Seed Farms*, 542 N.E.2d at 1391 (evidence to support final determination must be more than a scintilla).

The Court is well aware that the assessment of property is not an exact science and that there are uncertainties in some taxation matters. *See e.g., Estate of McLendon v. Commissioner*, 135 F.3d 1017, 1021–23 (5th Cir.1998) (due to uncertainty of calculation of the value of future interests, use of actuarial tables is "tolerated"); *Yoon v. Commissioner*, 135 F.3d 1007, 1013 (5th Cir.1998) (establishment of taxpayer's net worth does not

---

15. Although the hearing officer's trial testimony concerning the occupancy rate of the Wood Property may serve as general basis for rejecting Clark's claim of a large amount of obsolescence, it does not explain why the obsolescence of the Wood Property is quantified at 5%.

16. This case demonstrates why the establishment of a prima facie case is not a sine qua non to a finding that a State Board final determination is unsupported by substantial evidence. Clark has not offered any evidence tending to establish what the proper quantification of the Wood

Property's obsolescence. He has, however, demonstrated that the final determination of the State Board is unsupported by substantial evidence. As Clark has shown through his questioning of the State Board hearing officer, there is no basis for the decision to quantify the Wood Property's obsolescence at 5%. The hearing officer may well have used "sound judgment" to arrive at that figure. She may also have picked the figure out of thin air. On the basis of the record, there is no way to tell how she arrived at 5% obsolescence.

have to be done with mathematical precision, rather court must be satisfied that the IRS' determination of net worth is reasonably certain); *Jones v. Commissioner*, 903 F.2d 1301, 1303–04 (10th Cir.1990) (reconstruction of taxpayer's income may be based on non-arbitrary estimates).

In this case, however, the quantification of the Wood Property's obsolescence is not reasonably certain. In its final determination, the State Board merely asserts its conclusion that the evidence in the case warrants that the Wood Property receive 5% obsolescence. There is no factual predicate for this conclusion, just the word of a governmental official. *Cf. Yoon*, 135 F.3d at 1013 (IRS' determination of tax liability without evidentiary predicate is a naked assessment). Because Clark has demonstrated that the State Board has failed to support its decision to quantify the Wood Property's obsolescence at 5%, this issue is REMANDED to the State Board for further consideration.

■ The Court cannot help but note its frustration with this result. It is apparent that the taxpayer made a half-hearted case of obsolescence at the administrative level. It is equally apparent that the State Board made little or no effort to explain how it quantified the obsolescence of the Wood Property. The issue of the Wood Property's obsolescence then proceeded to this Court and forced this Court to choose between holding for the taxpayer, who presented no evidence of how the Wood Property's obsolescence should be quantified (other than a conclusory statement in a document entitled "Assessment Review and Analysis" (Joint Ex. 5 at 4)) and holding for the State Board, when the State Board had absolutely no evidence to support its choice of 5% obsolescence other than a reference to the apparently unfettered discretion of its hearing officer.

What concerns this Court is not the "equities" of this result: the bottom line is that Clark has demonstrated that the State Board's final determination of 5% obsolescence is unsupported by substantial evidence; consequently, the final determination must be reversed. What does concern this Court is the fact that the state of the law allows a taxpayer to present a half-hearted case of obsolescence before the State Board, call the State Board hearing officer to the stand in this Court to "explain" the quantification of obsolescence, and secure a reversal of the final determination. This results in a tremendous waste of time and scarce judicial resources.

■ This is an intolerable state of affairs. The administration of this state's property taxation system is best served by having taxpayers make detailed factual presentations of a given improvement's obsolescence to the State Board, the acknowledged property tax experts. The fact that the State Board's regulations concerning obsolescence are less than satisfactory does not alter this conclusion. It is axiomatic that the determination of a specific amount of obsolescence for an improvement that is the subject of an original tax appeal will ultimately be made by the State Board. *See* IND.CODE ANN. § 6-1.1–15–8 (West Supp.1997); *Foursquare Tabernacle Church of God in Christ v. State Bd. of Tax Comm'rs*, 550 N.E.2d 850, 852 (Ind. Tax Ct.1990) (Tax Court cannot carry out administrative function of assessing property.). For these reasons, this Court will not consider taxpayer complaints concerning obsolescence in cases where the State Board holds a hearing concerning an assessment (whether on a Form 131 Petition or otherwise) after the date of this opinion, unless the taxpayer has identified the causes of the alleged obsolescence and presented probative evidence that would support a quantification of obsolescence at the administrative level.[17]

---

17. The Court notes that Mr. Miller's conclusory statement that "it is apparent that a 15% to 20% obsolescence factor should be applied" (Joint Ex. 5 at 4) will not satisfy Clark's burden of quantifying obsolescence on remand for two reasons. First, it fails to explain how the alleged causes of obsolescence translate into the 15–20% figure; it is as baseless as the 5% figure determined by the State Board. Second, Mr. Miller is a contingently paid witness. His employer, Landmark Ap-praisals, receives payments for its property tax consulting services based on the amount a taxpayer's property taxes are reduced. Past decisions of this Court have evaluated the opinion testimony of contingently paid witnesses in light of the contingent nature of their compensation. *See, e.g., Wirth v. State Bd. of Tax Comm'rs*, 613 N.E.2d 874, 876–77 (Ind.Tax Ct.1993). The State Board is entitled to do so as well.

■ This will force taxpayers to identify alleged causes of obsolescence and offer evidence concerning the quantification of that alleged obsolescence *before the case is heard in this Court.* This Court's review of State Board final determinations will therefore be based on the evidence, and taxpayers will not be able to rely on the ·inadequacies of the present method for quantifying obsolescence to get a second bite at the apple.[18]

## II. The Salisbury Property

■ **a. Grade**—Clark challenges the C grade given to the Salisbury Property. Clark contends that the Salisbury Property does not conform to the base specifications of the GCM Pricing Schedule used to assess the Salisbury Property. Like the GCR Pricing Schedule, the GCM Pricing Schedule presumes the existence of concrete back-up walls.

At trial, Mr. Miller testified that the Salisbury Property basement contained concrete back-up walls, but that the other floors did not.[19] The State Board hearing officer testified that she did not know whether the Salisbury Property contained back-up walls. (Trial Tr. at 56). The State Board argues that there was no proof that the Salisbury Property lacked concrete back-up walls and contends that the only real proof concerning the issue is a photograph demonstrating the existence of a concrete back-up wall. (Joint Ex. 12, photograph 14).

As was the case with the Wood Property, Clark has made a prima facie case demonstrating that the assessment of the Salisbury Property was erroneous. Mr. Miller's testimony is sufficient to establish the fact that concrete back-up walls did not exist on all floors of the Salisbury Property. Mr. Miller based his conclusion that there were no concrete back-up walls in the Salisbury Property in floors above the basement on his observation of the wall thickness. He stated, "There isn't enough room to have [concrete] block included in there." (Trial Tr. at 20). The existence of a photograph showing a concrete back-up wall would be troubling if the State Board hearing officer had ascertained whether concrete back-up walls existed on *all* floors of the Salisbury Property. However, the State Board hearing officer did not do so, and this Court is left with Mr. Miller's testimony.[20]

This places the burden on the State Board to rebut this case by going forward with substantial evidence to support its determination of a C grade for the Salisbury Property. The State Board offered the hearing officer's conclusory statement that there was nothing below average about the property (Trial Tr. at 96), and her opinion that the Salisbury Property was comparable to other

---

**18.** The Court understands that those familiar with the True Tax Value system will wonder how one is supposed to quantify obsolescence because the regulations provide no specific guidance on how obsolescence is to be quantified. However, the regulations "tie the definition of obsolescence . directly to that applied by professional appraisers under the cost approach...." *Canal Square,* 694 N.E.2d at 806. Therefore, using generally recognized appraisal methods for quantifying obsolescence is a permissible means of quantifying obsolescence under the True Tax Value system. *See id.* at 806–07.

In arriving at this conclusion, the Court is fully aware that the State Board is not required to consider "real world" evidence until May 11, 1999. *See Town of St. John v. State Bd. of Tax Comm'rs,* 691 N.E.2d 1387 (Ind.Tax Ct. 1998) (order and judgment entry). Quantification of obsolescence by using generally recognized appraisal methods involves "real world" evidence. However, requiring taxpayers to quantify obsolescence by these methods and requiring the State Board to deal with the taxpayer's evidence does not run afoul of this Court's order and judgment entry in *Town of St. John* because the regulation describing obsolescence incorporates real world and market concepts, such as decreased market acceptability. *See* Ind.Admin.Code tit. 50, r. 2.1–5–1. Because the regulation incorporates those concepts, use of those concepts in quantifying obsolescence is consistent with Ind. Code Ann. § 6–1.1–31–6(c) (West 1989), which provides: "True tax value is the value determined under the rules of the state board of tax commissioners."

**19.** ·Mr. Miller also testified that there were other ways in which the Salisbury Property deviated from the base specifications. However, Clark did not present this evidence at the administrative level. Consequently, it will not be considered here. *See* Ind.Code Ann. § 33–3–5–14; *Gatling Gun,* 420 N.E.2d at 1328.

**20.** Although Mr. Miller is a contingently paid witness, his testimony concerning the lack of concrete back-up walls is based on actual observation and therefore will not be received with the same skepticism as his opinion testimony would be. *See supra* note 17.

properties receiving a C grade (Trial Tr. at 105).

This does not satisfy the State Board's burden. As with the Wood Property, the State Board has not shown that the Salisbury Property's lowered reproduction cost resulting from the deviation from the base specifications was balanced by other features of the Salisbury Property. Similarly, because the State Board hearing officer did not know whether the Salisbury Property conformed to the base specifications, she was not in a position to determine whether other properties were indeed comparable. Her comparison, therefore, cannot constitute the substantial evidence needed to support a State Board final determination. Accordingly, this issue is REMANDED to the State Board for further consideration.[21]

 **b. Obsolescence Depreciation—** Originally, the BOR awarded the Salisbury Property no obsolescence depreciation. In its final determination, the State Board awarded the Salisbury Property 5% obsolescence depreciation due to the lack of adequate parking. Clark contends that the Salisbury Property is entitled to more obsolescence depreciation. Clark makes the same arguments as he did with the Wood Property. Clark contends that there were additional causes of obsolescence not accounted for in the State Board final determination, such as the lack of an elevator, building code violations, and financial statements demonstrating allegedly excessive maintenance costs. Clark also contends that the State Board failed to support its quantification of the Salisbury Property's obsolescence at 5%.

As for Clark's first contention, the Court finds that Clark has made a prima facie showing that the State Board erred in its assignment of 5% obsolescence to the Salisbury Property. The building code violations and the lack of an elevator[22] could adversely affect the rental income that the property would otherwise receive. This constitutes a prima facie case of obsolescence. Therefore, it was incumbent upon the State Board to rebut this evidence and establish a basis for its final determination. *See GTE N.*, 634 N.E.2d at 887.

The Court finds that the State Board has rebutted the taxpayer's prima facie case. At trial, the State Board hearing officer testified that, like the Wood Property, the Salisbury Property had a low vacancy rate.[23] The State Board could have rationally concluded that, in light of the Salisbury Property's high occupancy rate, the additional alleged causes of obsolescence did not cause the Salisbury Property to lose value. This placed the burden on Clark to come forward with additional evidence to undermine this conclusion. Clark has failed to do so. Consequently, the final determination of the State Board will not be disturbed on this basis.

 However, the State Board's final determination of the obsolescence of the Salisbury Property lacks a sufficient evidentiary basis. Although the State Board has offered evidence (i.e., the low vacancy rate) that the Salisbury Property is not entitled to a large amount of obsolescence depreciation, like its treatment of the Wood Property, it has offered no justification for the *specific* amount of obsolescence depreciation awarded the Salisbury Property. When asked to explain the 5% obsolescence depreciation, the State Board hearing officer replied, "I gave it 5% obsolescence just basically because it thought it might be a nice idea to do that because of the parking." (Trial Tr. at 100). The quantification of obsolescence is not to be done by nice ideas, but rather by substantial evidence. Accordingly, this issue is REMANDED to the State Board for further consideration.

 *c.* **The Use of the GCM Pricing Schedule—**Clark contends that the State Board erred in choosing the GCM Pricing

---

**21.** The Court is confident that the factual issue concerning the concrete back-up walls (which should have been resolved at the administrative level) will be satisfactorily resolved on remand.

**22.** The financial statements were not considered in the determination that Clark has established a prima facie case. *See supra* note 13.

**23.** The State Board failed to mention the high occupancy rate of the Salisbury Property in its final determination. *See supra* note 12.

Schedule instead of the GCR Pricing Schedule to assess the Salisbury Property. In support of its contention, Clark argues that, under the regulations, the Salisbury Property only has three stories, instead of four. This, according to Clark, means that the GCR Apartment model, which is applicable to "Commercial flats (1–3 stories)" should have been used.[24] IND.ADMIN.CODE tit. 50, r. 2.1–4–4 (1992) (codified in present form at *id.* r. 2.2–11–3 (1996)).

The crux of Clark's argument lies in the definition of "ground story" or "first story" (the terms are synonymous) as defined in the regulations. *See* IND.ADMIN.CODE tit. 50, r. 2.1–6–1 (1992) (codified in present form at *id.* r. 2.2–16–2(43) (1996)). A "ground story" is "the first story lying wholly above the ground level." *Id.* In the Salisbury Property, there are four floors containing apartments. (Joint Ex. 12, photograph 9). One of those floors is partially below ground level. (Joint Ex. 12, photograph 9). This, according to Clark, means that for purposes of the regulations, the Salisbury Property only contains three stories.

Clark is incorrect. The regulations also define "basement" as a "building *story* which is wholly or partly below the grade level." IND.ADMIN.CODE tit. 50, r. 2.1–6–1 (emphasis added) (codified in present for at *id.* r. 2.2–16–2(5)(1996)). Basements have different reproduction costs under the pricing schedules than other floors.[25] *See, e.g.,* IND.ADMIN.CODE tit. 50, r. 2.1–4–5, Schedule A.1 (1992) (codified in present form at *id.* r. 2.2–11–6, Schedule A.1 (1996)). However, that does not mean that a basement cannot be considered a story for the purpose of choosing a pricing schedule/model. The evidence in this case clearly demonstrated that the greater part of the "basement" was full of apartments and constructed similarly to the upper floors. Accordingly, it was permissible for the State Board to treat the "basement" as a story for purposes of classifying the Salisbury Property as a four-story apart-

ment building. *Cf. Herb v. State Bd. of Tax Comm'rs,* 656 N.E.2d 890 (Ind.Tax Ct.1995). Therefore, the State Board did not abuse its discretion in choosing the GCM Pricing Schedule to assess the Salisbury Property. Accordingly, this Court AFFIRMS the final determination of the State Board on this issue.

## CONCLUSION

For the above stated reasons, this cause is REMANDED to the State Board for further consideration consistent with this opinion.

---

**24.** That the GCR·Pricing Schedule includes three-story apartment buildings is somewhat mystifying in light of the fact that the GCR Pricing Schedule "should only be used for structures that are one or two stories." IND ADMIN.CODE tit. 50, r. 2.1–4–3(a) (1992). The regulations currently in force have corrected this problem. *See id.* r. 2.2–10–6.1 (1996).

**25.** The Salisbury Property received an adjustment based on the fact that the bottom floor had some wood joist construction. (Trial Tr. at 55, 99). Had Clark pointed out other ways in which the Salisbury Property deviated from the GCM Pricing Schedule because one of the floors was partially below grade, additional adjustments may have been appropriate.