Ronald D. CLARK, Petitioner,

v.

STATE BOARD OF TAX
COMMISSIONERS,
Respondent.

No. 49T10–9701–TA–53.

Tax Court of Indiana.

Jan. 8, 2001.

Curtis J. Dickinson, Dickinson & Abel, David L. Pippen, Attorney at Law, Indianapolis, IN, Attorneys for Petitioner.

Steve Carter, Attorney General of Indiana, Kathryn Symmes Kirk, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

■ Petitioner Ronald D. Clark appeals the final determination of the State Board of Tax Commissioners (State Board) establishing the assessed value for Clark's property as of March 1, 1993. Clark presents various issues for review. These are restated as:

I. Whether the State Board improperly adjusted the grade assigned Clark's apartment units from C to C–1 in order to account for items included as part of the GCR Apartment model but not found in the subject units; and

II. Whether the State Board erroneously refused to recognize causes of economic obsolescence in the subject units; [1]

---

1. Clark raises one additional issue not considered by the Court: whether the State Board's assessment regulations violate both the United States Constitution and the Indiana Constitution. The fact that the subject property was assessed under an unconstitutional regulation does not mean the assessment will be invalidated on that basis. *Whitley Prods., Inc. v. State Bd. of Tax Comm'rs*, 704 N.E.2d 1113, 1121 (Ind. Tax Ct.1998) (citations omitted), *review denied.* "Real property must still be assessed, and, until the new regulations are in place, must be assessed under the present system." *Id.* *See also Town of St. John v. State Bd. of Tax Comm'rs*, 729 N.E.2d 242, 246 & 251 (Ind. Tax Ct.2000) (ordering that all real property in Indiana shall be reassessed under new, constitutional rules as of March 1, 2002, and, until then, real property

## FACTS AND PROCEDURAL HISTORY

Clark owns a partnership interest in apartment units in Tippecanoe County, Indiana. The apartments are leased primarily to students attending Purdue University. On December 9, 1993, Clark filed a Form 131 petition for review with the State Board, contending that an "improper amount of obsolescence depreciation [had been] applied." (State Bd. Tr. of Proceedings, Ex. A.) An administrative hearing was conducted on February 20, 1996. At the hearing, Clark claimed that the "grade of the subject property is more accurately described as a D+1," in addition to requesting a fifteen to twenty percent adjustment for economic obsolescence. (Joint Ex. 2.) The subject property was inspected on February 21, 1996. The State Board issued a final determination on November 22, 1996, lowering the subject units' grade from a C to a C–1 but declining to apply an obsolescence adjustment to the units. (State Bd. Tr. of Proceedings, Ex. C.) Clark filed this original tax appeal on January 6, 1997. The Court held a trial on June 18, 1998. The parties presented oral arguments to the Court on January 25, 1999. Additional facts will be supplied where necessary.

## ANALYSIS AND OPINION

### Standard of Review

■ This Court gives the final determinations of the State Board great deference when the State Board acts within the scope of its authority. *Wetzel Enters., Inc. v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1259, 1261 (Ind. Tax Ct.1998). Ac-

cordingly, this Court reverses final determinations of the State Board only when those decisions are unsupported by substantial evidence, are arbitrary or capricious, constitute an abuse of discretion, or exceed statutory authority. *Id.* The taxpayer bears the burden of demonstrating the invalidity of the State Board's final determination. *Clark v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1230, 1233 (Ind. Tax Ct.1998).

### Discussion

#### I. Grade Adjustment

■ Clark argues that the C–1 grade assigned by the State Board was improper because the State Board provided no basis for its determination.[2] Clark's position is based upon the lack of specificity in the State Board's final determination, which supported the change in grade with this single sentence explanation: "Upon inspection of the property, it is determined [that] the property is indicative of a C–1 grade." (State Bd. Tr. of Proceedings, Ex. C.) His basic argument is that the State Board's reasons for assigning the C–1 grade "can only be considered *post hoc* rationalizations." (Pet'r Br. at 5.)

As testified to by the State Board's hearing officer Ellen Yuhan, the State Board's grade adjustment accounted for items missing from the units that are included as part of the GCR Apartment model. (Trial Tr. at 28–29.) Specifically, the adjustment accounted for the subject units' eight-foot walls (instead of the nine-foot wall height provided by the model), lack of concrete block back-up walls[3] and

---

tax assessments shall be made in accordance with the current system).

2. The Court notes that because Clark did not raise the grade issue in its Form 131 petition for review, the State Board was not required to but, instead, choose to consider it as part of its administrative review. *Whitley Prods.*, 704 N.E.2d at 1119 ("[T]he State may limit its inquiry to only those errors raised by the taxpayer.") *See also* IND.CODE ANN. § 6–1.1–15–4 (1989) (stating that State Board "may

assess the property in question, correcting any errors which may have been made" in reviewing taxpayer's appeal) (amended 1993, 1995 & 1997).

3. According to Yuhan, the subject units had walls that were approximately nineteen percent brick and eighty-one percent "frame." (Trial Tr. at 12.) For the GCR Apartment model, improvements with Type 2 walls have "Face brick on concrete block back-up for a 9 [foot] wall." IND.ADMIN CODE tit. 50, r. 2.1–4–7

lack of sliding glass doors. *Id.;* IND.ADMIN.CODE tit. 50, r. 2.1–4–7 (1992) (codified in present form at *id.,* r. 2.2–11–3 (1996)). Using the regulations' unit-in-place tables, *see* IND.ADMIN.CODE tit. 50, r. 2.1–4–10 (1992) (codified in present form at *id.,* r. 2.2–15–1 (1996)), Yuhan calculated the value of these missing items. (Trial Tr. at 29–30.) She determined their value to equal approximately five percent of the assessment. (Trial Tr. at 28–29.) Therefore, she assigned the subject units a grade of C–1, effectively lowering their assessed value by five percent. IND.ADMIN.CODE tit. 50, r. 2.1–4–5 (1992) (Schedule F) (codified in present form at *id.,* r. 2.2–11–7 (1996)).

 Nowhere in its final determination does the State Board explain its rationale for adjusting the subject units' grade. "It is well-settled that the State Board, in general, may not support a final determination by referring to reasons that were not previously ruled upon, but that are offered as post hoc rationalizations." *Word of His Grace Fellowship, Inc. v. State Bd. of Tax Comm'rs,* 711 N.E.2d 875, 878 (Ind. Tax Ct.1999). Here, Yuhan's trial testimony provides the first explanation as to her methodology for determining a grade adjustment. The State Board may not provide its explanation for the first time on appeal. *Id.* at 878–79 (explaining reasons for this rule). Therefore, the Court REVERSES and REMANDS the State Board's grade determination.

 The State Board's adjustment was not made to account for variations in its quality of materials, workmanship and

design per IND.ADMIN.CODE tit. 50, r. 2.1–4–3(f) (1992) (codified in present form at *id.,* r. 2.2–10–3 (1996)). Rather, as noted *supra,* Yuhan made the adjustment to account for deviations of the subject units from the specifications of the GCR Apartment model. An improvement's deviation from the model used to assess it may be accounted for in two ways. "The preferred method of accounting for this deviation is to use separate schedules that show the costs of certain components and features present in the model." *Whitley Prods.,* 704 N.E.2d at 1117 (citations omitted). This method allows an assessing official to make an objective adjustment to the improvement's base rate. *Id.* Another method to account for an improvement's deviation is application of a grade adjustment. *Id.* "Where possible, this type of an adjustment should be avoided" because it requires an assessing official's subjective judgment. *Id.* "However, because the component (base rate adjustment) schedules are not comprehensive, this type of adjustment may be necessary." *Id.*

 Yuhan testified that she used the unit-in-place tables to calculate the value of the missing items. (Trial Tr. at 29–30.) Thus, she could have objectively accounted for the deviations using the unit-in-place tables. Use of objective adjustments is preferable and must be done where the base rate adjustment and/or unit-in-place tables permit the deviations' values to be reasonably calculated.[4] *See Whitley Prods.,* 704 N.E.2d at 1117; *see also Inland Steel Co. v. State Bd. of Tax Comm'rs,* 739 N.E.2d 201, 231–32 (Ind.

---

(1992). The subject units had no concrete block back-up walls. (Trial Tr. at 12.) Thus, Yuhan's grade adjustment in part accounted for missing concrete block back-up walls for approximately nineteen percent of the subject units' walls.

4. The 1992 regulations define "unit-in-place method" as a "method of computing the replacment [replacement] or reproduction cost of an improvement by applying established unit-in-place rates, developed to include cost of materials, equipment, labor, overhead and

profit, to the various construction units." IND.CODE ANN. tit. 50, r. 2.1–6–1 (1992). The current regulations explain that "Normally, [the unit-in-place cost] schedules are only used when an item cannot be priced from *cost schedules included in this article.*" IND. CODE ANN. tit. 50, r. 2.2–15–1 (1996). Thus, the unit-in-place tables must be used to account for deviations of the subject improvement from the model when the other base rate adjustment schedules do not provide ascertainable prices for the items at issue.

Tax Ct.2000) (noting that the "preferred method for calculating deviations from the models is to use separate schedules showing the costs of components" and concluding that taxpayer's use of unit-in-place tables to calculate a corresponding grade increase to account for items not included in model did not establish prima facie case as to grade), *pet. for review filed* Dec. 22, 2000.

■■■ Upon remand, Clark must submit probative evidence sufficient to establish a prima facie case as to grade. *See Whitley Prods.*, 704 N.E.2d at 1119; *CDI, Inc. v. State Bd. of Tax Comm'rs*, 725 N.E.2d 1015, 1019 (Ind. Tax Ct.2000); *see also King Indus. Corp. v. State Bd. of Tax Comm'rs*, 699 N.E.2d 338, 343 (Ind. Tax Ct.1999). The State Board must consider any probative evidence in a meaningful manner. *Clark*, 694 N.E.2d at 1235. If the State Board deems the grade to be other than that as shown by Clark's evidence, the State Board must support its final determination with substantial evidence.[5] The State Board is instructed to use the unit-in-place tables to calculate the value of those items included in the GCR Apartment model but not found in the subject units, where the State Board can reasonably identify and apply values for the missing items from the unit-in-place tables.[6] Accordingly, if the unit-in-place tables are used, the missing items cannot be the basis for the lowering of the subject units' grade in this case.[7]

## II. Economic Obsolescence

Clark argues that a reduction for economic obsolescence should have been applied to the subject units. (Pet'r Br. at 9–10.) Clark contends that he presented the State Board with "considerable evidence of causes of [economic] obsolescence." (Reply Br. at 5.) Specifically, he alleges that the high tenant turnover rate, excessive maintenance costs, lack of adequate parking and poor land-to-building ratio are all causes of economic obsolescence. (Pet'r Br. at 9.)

■■■ Clark had to present probative evidence sufficient to establish a prima facie case that the subject units suffered from causes of economic obsolescence. *See Western Select Properties v. State Bd. of Tax Comm'rs*, 639 N.E.2d 1068, 1075 (Ind. Tax Ct.1994); *see also Loveless Constr. Co. v. State Bd. of Tax Comm'rs*, 695 N.E.2d 1045, 1049–50 (Ind. Tax Ct.1998) (concluding that taxpayer's evidence constituted prima facie case of economic obsolescence), *review denied*. "Ob-

---

**5.** If the State Board deems Clark's evidence non-probative or concludes that Clark has not presented a prima facie case as to grade, it should indicate this in its final determination. Then, the State Board may merely state in its final determination that Clark takes nothing by his petition. In that event, the county's grade assignment stands. The Court observes, too, that if Clark fails to establish a prima facie case with probative evidence and the State Board again chooses to change the subject units' assigned grade, the State Board then must support its final determination with substantial evidence if Clark is prejudiced by the State Board's action. *See Whitley Prods.*, 704 N.E.2d at 1120 (concluding that, despite flaws in State Board's grading of subject property, lowering of grade by State Board did not prejudice taxpayer and therefore State Board's grade would not be reversed).

**6.** Any party advocating for adjustments to an improvement's value—not just the State Board—should use the unit-in-place tables, where values for items can be reasonably identified and applied using the unit-in-place tables (and where adjustments for items are not otherwise provided for by the regulations' cost schedules).

**7.** Clark claims that the regulations governing grade lack ascertainable standards and are therefore invalid. (Pet'r Br. at 6–7.) However, a taxpayer may not simply point out the inadequacies of the present assessment system and expect to secure a reversal. *White Swan Realty v. State Bd. of Tax Comm'rs*, 712 N.E.2d 555, 559 (Ind. Tax Ct.1999), *review denied*. "Instead, the taxpayer must offer probative evidence relating to the grade issue." *Id.* Clark's evidence, i.e., the written review and trial testimony of M. Drew Miller, is not probative evidence because it is conclusory in nature. *See CDI, Inc. v. State Bd. of Tax Comm'rs*, 725 N.E.2d 1015, 1020–21 (Ind. Tax Ct.2000). Thus, this argument also fails.

solescence depreciation is composed of functional and economic loss of value.... Economic obsolescence is caused by factors external to the property." IND.AD-MIN.CODE tit. 50, r. 2.1–5–1 (1992) (codified in present form at *id.*, 2.2–10–7(e) (1996)). Obsolescence is expressed as a percentage reduction in the remaining value of the subject improvement. *Id.* (codified in present form at *id.*, r. 2.2–10–7(f) (1996)). Determination of obsolescence involves (1) identification of causes of obsolescence and (2) quantification of the amount of obsolescence to be applied.[8] *Clark*, 694 N.E.2d at 1238. The regulations list various causes of economic obsolescence. IND.ADMIN.CODE tit. 50, r. 2.1–5–1 (1992) (codified in present form at *id.*, r. 2.2–10–7(e) (1996)). This list does not reference the impact of college students on leased apartment units or the effect of a high turnover ratio for leases; however, the list is illustrative, not exhaustive. *Lake County Trust v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1253, 1257 (Ind. Tax Ct.1998), *review denied.*

Clark's evidence consisted of Miller's review and trial testimony. (Reply Br. at 5.) Miller's review discusses causes of economic obsolescence over several paragraphs. In his review, Miller states that students tend to sign shorter lease terms and subject apartments to a higher degree of wear and tear than do non-student tenants. (Joint Ex. 2 at 2.) He asserts that this "translates [in]to higher than normal administration costs as well as higher maintenance costs [for repairs and painting]." (Joint Ex. 2 at 2.) These higher costs result in decreased cash flow resulting in a diminished value for the subject units. (Joint Ex. 2 at 2.) Miller states that the annual turnover rate for the subject units is seventy percent. (Joint Ex. 2 at 2.) He claims that the units suffer from limited parking due to a poor land-to-building ratio. (Joint Ex. 2 at 2.) This, he maintains, "contributes to lawn wear" and to damage to the units from "scrapes and dents when trying to get in and out of tight or improper parking spaces." (Joint Ex. 2 at 2.) This greater degree of wear and tear, Miller contends, leads to a shortened economic life expectancy for the units. (Joint Ex. 2 at 3.) Miller's review recommends application of a fifteen to twenty percent obsolescence factor to the units. (Joint Ex. 2 at 3.) The review cited no authority, although Miller did attach a one-page income statement dated December 31, 1993. (Joint Ex. 2 at 4.) The income statement shows the year-to-date rental income and security deposit income for the units, in addition to units' year-to-date expenses. (Joint Ex. 2 at 4.)

Miller testified at trial that the subject units suffered economic obsolescence because they were rented to students. (Trial Tr. at 34.) However, he admitted that Clark was not necessarily "losing money" in renting the units. (Trial Tr. at 34–35.) Miller opined that the high turnover rate detracted from cash flow. (Trial Tr. at 35.) He stated that there are income analysis methods that determine the degree of impact but that no analyses had been done in this case. (Trial Tr. at 35–36.)

■ Clark has not submitted probative evidence as to causes of economic obsolescence. First, the Court notes that Miller's review and his trial testimony are conclusory observations; they are unsupported statements that do not qualify as probative evidence. *CDI*, 725 N.E.2d at 1020–21. *See also Herb v. State Bd. of Tax Comm'rs*, 656 N.E.2d 890, 893 (Ind. Tax Ct.1995) ("Allegations, unsupported by factual evidence, remain mere allegations.") Assuming that the subject units do have a seventy percent annual turnover rate (an unsubstantiated figure), Clark does not submit evidence showing that this alleged fact causes overly burdensome administrative costs. Clark's financial statement was not probative as to obsolescence because it did not compare the subject units' rental income, security deposit income and maintenance expenses with those of other prop-

---

8. This case concerns only the first step, i.e., identifying causes of economic obsolescence.

erties with non-student populations. *But see Clark*, 694 N.E.2d at 1239 n. 13 (noting that under some circumstances financial statements, standing alone, may be probative as to obsolescence). Also, the alleged inadequacy of parking and poor land-to-building ratio could potentially reduce rental income to Clark. *Clark*, 694 N.E.2d at 1238–39. However, Clark in the present case submitted no evidence demonstrating what the ratio of parking spots per apartment or the land-to-building ratio actually is; the Court cannot and will not speculate as to the impact of these alleged deficiencies.[9]

Clark has provided the Court with no probative evidence showing that the subject units suffer from causes of economic obsolescence. Therefore, the State Board's final determination on this issue is AFFIRMED.

## CONCLUSION

For the aforementioned reasons, the State Board's final determination is REVERSED and REMANDED with respect to Issue I for further proceedings consistent with this opinion and is AFFIRMED with respect to Issue II.

---

9. Issues as to parking spots and land-to-building ratios involve questions of functional obsolescence, i.e., obsolescence caused by conditions internal to the property. *Clark*, 694 N.E.2d at 1238 (citing IND.ADMIN.CODE tit. 50, r. 2.1–5–1 (1992)). However, for ease of reference in this opinion, the Court considers these two points within the framework of Clark's economic obsolescence arguments.