PETITIONER APPEARING PRO SE:
**ANDY YOUNG**
Wadsworth, IL

ATTORNEY FOR RESPONDENT:
**RICARDO A. HALL**
KOPKA PINKUS DOLAN PC
Crown Point, IN

# IN THE
# INDIANA TAX COURT

| | | |
|---|---|---|
| GARY II LLC, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Cause No. 23T-TA-00012 |
| | ) | |
| LAKE COUNTY ASSESSOR, | ) | |
| | ) | |
| Respondent. | ) | |

FILED
Mar 13 2025, 4:03 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ON APPEAL FROM FIVE FINAL DETERMINATIONS OF
THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**March 13, 2025**

WENTWORTH, Senior J.

Gary II, LLC, appeals the Indiana Board of Tax Review's final determinations denying its challenge to the 2017 assessments of five of its properties. Gary II asserts that the Assessor determined the base rates using an improper process, timing, and comparables in establishing the valuation of its properties. Gary II also claims that the application of the 3% nonresidential property tax limitation[1] was contrary to law. Upon review, the Court affirms in part and reverses in part.

---

[1] Both the constitutional and statutory limitations on property tax liabilities are referred to as "tax caps" throughout this opinion. Property tax caps are given effect through a "credit against the person's property tax liability." See IND. CODE § 6-1.1-20.6-7.5 (2025).

# FACTS AND PROCEDURAL HISTORY

Gary II is a limited liability company owned by its sole member and manager, Andy Young. Gary II owns hundreds of property parcels in Calumet Township in Gary, Indiana. (See, e.g., Cert. Admin. R. Vol. 1 at 10-20.)[2] The five parcels under appeal have the following parcel numbers: 45-08-15-327-021.000-004, Petition No. 45-004-14-1-5-00001-21 ("Parcel 1"); 45-08-15-178-028.000-0004, Petition No. 45-004-17-1-5-00002-21 ("Parcel 2"); 45-08-15-307-020.000-004, Petition No. 45-004-17-1-5-00003-21 ("Parcel 3"); 45-08-15-309-001.000-004, Petition No. 45-004-17-1-5-00004-21 ("Parcel 4"); and 45-08-10-381-012.000-004, Petition No. 45-004-17-1-5-00005-21 ("Parcel 5"). (See Cert. Admin. R. Vols. 1 to 5 at 6.) All of them are situated in neighborhoods with a mix of vacant and improved land, as shown in GIS aerial photographs. (See Cert. Admin. R. Vols. 1 to 5 at 28.)

Gary II first appealed to the Lake County Property Tax Assessment Board of Appeals ("PTABOA"). The PTABOA left four of the five property assessments unchanged, and lowered the assessed value of Parcel 4. (Compare Cert. Admin. R. Vols. 1 to 3 and 5 at 6-8 with Cert. Admin. R. Vol. 4 at 6-8.) Subsequently, Gary II appealed the PTABOA's decisions to the Indiana Board, filing separate petitions for each property. (See, e.g., Cert. Admin. R. Vol. 1 at 1-5.)

In the five separate hearings before the Indiana Board, Gary II argued that the Lake County Assessor improperly established the Calumet Township base rates and wrongly applied the 3% tax cap to its properties. (See, e.g., Cert. Admin. R. Vol. 1 at 3-

---

[2] The Indiana Board held separate hearings on each of the five appeals, and thus, prepared five separate certified administrative records. The volume of each certified administrative record corresponds to the designated parcel number and the Indiana Board petition number as identified above, such that Volume 1 pertains to Parcel 1, Volume 2 to Parcel 2, and so forth.

5, 293-96 ¶ 10.) Gary II provided evidence in support of its claim including the five property record cards, parcel identification information, Treasurer's tax records, GIS maps, three appraisal reports for other properties, four Indiana University Northwest reports, a 2022 Lake County Land Order, three pages from the 2021 Real Property Assessment Manual, and one page from a final determination of another property. (See, e.g., Cert. Admin. R. Vol 1 at 291-92 ¶ 6(a).)

The Indiana Board issued five nearly identical final determinations that ultimately found that "[b]ecause Gary II offered no probative market-based evidence to demonstrate [each] subject property's market value-in-use for 2017, it failed to make a prima facie case for a lower assessment." (See, e.g., Cert. Admin. R. Vol. 1 at 295 ¶ 10(g).) The Indiana Board further determined that Gary II's tax cap arguments were ineffective because the plain language of the tax cap statutes, not the zoning classification, determines the appropriate property tax cap to apply. (See, e.g., Cert. Admin. R. Vol. 1 at 293-96 ¶ 10(j).)

Subsequently, Gary II filed this original tax appeal. Additional facts will be added as necessary.

**STANDARD OF REVIEW**

The Court reverses a final determination of the Indiana Board only when it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. See IND. CODE § 33-26-6-6(e) (2025). The party seeking reversal bears the burden of demonstrating the

3

final determination's invalidity.  See Elkhart Cnty. Assessor v. Lexington Square, LLC, 219 N.E.3d 236, 240 (Ind. Tax Ct. 2023).

## ANALYSIS

### I.  Base Rate

Gary II claims that the final determinations affirming the Assessor's determination of the Calumet Township base rates was arbitrary and capricious, contrary to law, and unsupported by substantial evidence. (See Pet'r Br. at 2-3.)  Gary II explains that the process, the timing, and the comparables the Assessor used to establish the base rates underlying its assessments are faulty.  (See Pet'r Br. at 3-7.)

First, Gary II maintains that the process the Assessor used to establish the base rates was inconsistent with the statute.  (See Pet'r Br. at 4.)  Gary II stated that "[i]t has been shown that while Indiana Statute requires the Lake County Assessor to establish the base rates for land values, and for the Lake County Assessor to provide them to the Calumet Township Assessor, Petitioner has determined that it was being done just the opposite." (Pet'r Br. at 4; see also Cert. Admin. R. at 320.)  This argument is conclusory, and thus unpersuasive, because it includes no evidentiary support for who did what, when.  (See, e.g., Cert. Admin. R. Vol. 1 at 1-326.)  Moreover, regardless of the order of events, the Township Assessor is empowered to perform all statutory assessment duties under Indiana Code §§ 6-1.1 et seq. See IND. CODE § 36-6-5-3(a) (2017).

Gary II also claims that in light of the lack of sales of vacant lots in Calumet Township, the Assessor failed to follow "the rules[, which] state[d] that if there [were] not enough sales to reach the [required] threshold, the local assessor must hire a local licensed real estate professional for an opinion of value, this professional must use

4

properties that are actually comparable." (See Pet'r Br. at 6.)   Gary II has not, however, provided supporting evidence or even analysis to support this claim. (See, e.g., Cert. Admin. R. Vol. 1 at 1-326.)  Once again, therefore, the lack of evidence renders this claim illusory and unpersuasive.

Second, Gary II asserts that the base rates applied to its Calumet Township property for its 2017 assessments were untimely.  In support, Gary II states that the rates for 2017 "were submitted more than 4 years after the fact and that the sales data used was derived from sales that took place up to 4 years after the base rates were due to become effective." (Pet'r Br. at 4.) This argument reflects, however, a misunderstanding of the timing of reassessment.  The four-year period is not the time during which a particular determination of land values applies, but is the period during which land values must be determined at least once.  IND. CODE § 6-1.1-4-4.2(a)(4) (2017) (amended 2023).  The base rates become effective for taxes first due the following year, so they apply here prospectively, not retroactively as Gary II contends. I.C. § 6-1.1-4-4.2(a)(7).  The base rates applicable in 2017 were established in the 2012 land values determination from the previous four-year cycle, not from the 2018 land values determination.  (See, e.g., Cert. Admin. R. Vol. 1 at 275-76.)  Therefore, the Court is not persuaded that the base rates applicable to the 2017 tax year were not timely submitted.

Finally, Gary II complains about the comparables the Assessor used to develop the Calumet Township base rates.  (See Pet'r Br. at 4-8.)  The Assessor "had appraisals performed on 3 lots which were intended to represent a sample set." (See Pet'r Br. at 4.)  "[T]he assessments on these 3 parcels . . . were significantly different than the

assessed values on record, [but] the local assessors never took any action to modify the assessments [] to comport with the findings of the appraisals." (See Pet'r Br. at 6.) Gary II explains that "[n]early all sales data used by assessing officials to determine the base rates for land for the relevant years were from property with improvements on them" because "[t]here were not enough sales of vacant lots to determine market value through the study of sales." (See Pet'r Br. at 7.) Furthermore, Gary II provided reports done by Indiana University Northwest regarding the difficulty in finding buyers for certain vacant parcels of land, referred to a "churners,"[3] in the area. (See, e.g., Cert. Admin. R. Vol. 1 at 143-261.)

Although Gary II's evidence has raised concerns about the manner in which the Assessor established base rates related to the assessments at issue, Gary II failed "to present objectively verifiable, market-based evidence to demonstrate [its properties were] over-assessed." See Piotrowski BK #5643, LLC v. Shelby Cnty. Assessor, 177 N.E.3d 127, 133 (Ind. Tax Ct. 2021). On the evidence presented, the Court does not find the final determinations affirming the properties' base rates at issue to be arbitrary and capricious, contrary to law, or unsupported by substantial evidence. Accordingly, the Court will not reverse the Indiana Board's final determinations on this basis.

## II. **Property Tax Cap**

Next, Gary II asserts that the Indiana Board's determination that its properties were not residential properties entitled to the 2% property tax cap is contrary to law and unsupported by substantial evidence. (See Pet'r Br. at 9-16.) The Indiana Board

---

[3] "A churner is a parcel that has gone through one or more Treasurer's Tax Sales and then a Commissioner's Tax Certificate Sale without a bid." (Cert. Admin. R. Vol. 1 at 239.)

reasoned that "[u]nder the plain language of the statute, the subject propert[ies] do[] not qualify as residential propert[ies] because [they have] no dwelling units and [are] not leased for placement of a manufactured or mobile home." (See, e.g., Cert. Admin. R. Vol. 1 at 296 ¶ (10)(j).)

The statutory definition of "residential property" is:

real property that consists of any of the following:

(1) A single family dwelling that is not part of a homestead and the land, not exceeding one (1) acre, on which the dwelling is located.

(2) Real property that consists of:

(A) a building that includes two (2) or more dwelling units;

(B) any common areas shared by the dwelling units (including any land that is a common area, as described in section 1.2(b)(2) of this chapter); and

(C) the land on which the building is located.

(3) Land rented or leased for the placement of a manufactured home or mobile home, including any common areas shared by the manufactured homes or mobile homes.

The term includes a single family dwelling that is under construction and the land, not exceeding one (1) acre, on which the dwelling will be located. The term does not include real property that consists of a commercial hotel, motel, inn, tourist camp, or tourist cabin.

IND. CODE § 6-1.1-20.6-4 (2017) (amended 2023). In other words, the statute generally maintains that a property is "residential" because of its relation to, or existence as, a

dwelling.

The final determination further reasoned that although Gary II's properties were not described in the definition of "residential property," they did meet the statutory definition of "nonresidential real property," which states:

> (a) As used in this chapter, 'nonresidential real property' refers to either of the following:
>
> (1) Real property that:
>
>     (A) is not:
>
>         (i) a homestead; or
>
>         (ii) residential property; and
>
>     (B) consists of:
>
>         (i) a building or other land improvement; and
>
>         (ii) the land, not exceeding the area of the building footprint or improvement footprint, on which the building or improvement is located.
>
> (2) Undeveloped land in the amount of the remainder of:
>
>     (A) The area of a parcel; minus
>
>     (B) The area of the parcel that is part of :
>
>         (i) a homestead; or
>
>         (ii) residential property.
>
> (b) The term does not include agricultural land.

IND. CODE § 6-1.1-20.6-2.5 (2017) (amended 2023). The Indiana Board explained that

this statute applies to the properties at issue "because [they are] undeveloped land that [are] not part of a homestead or other residential property as defined by Ind[iana] Code § 6-1.1-20.6-4." (See, e.g., Cert. Admin. R. Vol. 1 at 296 ¶ 10(j).)

**Contrary to Law**

Gary II claims that the Indiana Board's rigid reading of these statutory definitions is contrary to the Indiana Constitution's requirements for classifying properties for property tax cap purposes. (See Pet'r Br. at 14-15.) Inquiry into the proper application of tax caps is not a novel endeavor. The Court has evaluated the meaning of the statutory tax cap statutes in several cases where the application of a specific tax cap was at issue. See e.g., Schiffler v. Marion Cnty. Assessor, 184 N.E.3d 726, 729-31 (Ind. Tax Ct. 2022) (holding that the carriage house and detached garage qualified for the 1% tax cap as they were used as extensions of taxpayer's principal residence), review denied; Buckeye Hospitality Dupont, LLC v. O'Day, 144 N.E.3d 850, 855-56 (Ind. Tax Ct. 2020) (holding that because the owner's entire property met the statutory definition of a hotel, its classification, rather than its intended or actual use, determined its eligibility for the 2% tax cap); Universal Health Realty v. Fluty, 144 N.E.3d 857, 861-63 (Ind. Tax Ct. 2020) (holding that the property did not qualify for the 2% tax cap because it was neither a licensed long-term care facility nor a residential property containing multiple dwelling units); Hamilton Square Inv., LLC v. Hamilton Cnty. Assessor, 60 N.E.3d 313, 317-18 (Ind. Tax Ct. 2016) (holding that common areas, whether within or separate from an apartment building, qualify for the 2% tax cap if available for the shared use of tenants),

9

review denied.  In contrast, this appeal is only the second time[4] statutory tax caps have

been challenged for a constitutional infirmity, and is thus a case of first impression

regarding whether the statutory residential property classification has been properly

applied under the constitutional standard.

In 2010, two years after the enactment of the statutory tax caps, the Indiana

Constitution was amended to limit a property's tax liability to a percentage of the

property's assessed valuation based on the property's classification.  IND. CONST. art.

10, § 1(f).[5]  Effective beginning in tax year 2012, subsection (f) of the Indiana

Constitution required the General Assembly to limit the amount of a taxpayer's property

tax liability according to explicitly defined classifications:

> (1) A taxpayer's property tax liability on <u>tangible property
> described in subsection (c)(4)</u>[6] may not exceed one percent
> (1%) of the gross assessed value of the property that is the
> basis for the determination of property taxes.
>
> (2) A taxpayer's property tax liability on <u>other residential
> property</u> may not exceed two percent (2%) of the gross
> assessed value of the property that is the basis for the
> determination of property taxes.
>
> (3) A taxpayer's property tax liability on <u>agricultural land</u> may
> not exceed two percent (2%) of the gross assessed value of
> the land that is the basis for the determination of property

---

[4] The first case to address the constitutionality of the statutory tax caps was <u>Sawlani v. Lake County Assessor</u>. <u>Sawlani v. Lake Cnty. Assessor</u>, 240 N.E.3d 734 (Ind. Tax Ct. 2024), petition for review filed (Ind. Sept. 30, 2024).

[5]  A history of the development of Indiana's property tax caps can be found in the recent <u>Sawlani</u> Tax Court case. <u>Id.</u> at 738-43.

[6]  The classification of property eligible for the 1% tax liability limitation is described in subsection (c)(4) as "[t]angible property, including curtilage, used as a principal place of residence by an: (A) owner of the property; (B) individual who is buying the tangible property under a contract; or (C) individual who has a beneficial interest in the owner of the tangible property." IND. CONST. art. 10, § 1(c)(4).

taxes.

> (4) A taxpayer's property tax liability on <u>other real property</u> may not exceed three percent (3%) of the gross assessed value of the property that is the basis for the determination of property taxes.

IND. CONST. art. 10, § 1(f) (emphases added). The property classification eligible for the 1% tax cap is described in section 1(c)(4) as "[t]angible property, including curtilage, <u>used</u> as a principal place of residence[.]" IND. CONST. art. 10, § 1(c)(4) (emphasis added). The Constitution also defines three other classifications of property that are eligible for the 2% or 3% limitation as:

> (1) "<u>Other residential property</u>" means tangible property (other than tangible property described in subsection (c)(4)) that is <u>used</u> for residential purposes.
>
> (2) "<u>Agricultural land</u>" means land devoted to agricultural <u>use</u>.
>
> (3) "<u>Other real property</u>" means real property that is not tangible property described in subsection (c)(4), is not other residential property, and is not agricultural land.

IND. CONST. art. 10, § 1(e) (emphases added). Accordingly, the Constitution expressly states that a property's classification for purposes of the tax caps depends on its <u>use</u>. See IND. CONST. art. 10, § 1(c)(4), (f)(1)–(3).

Remarkably, the statutes defining residential and nonresidential classifications for tax caps do not express the centrality of the "use" of a property as the Indiana Constitution does, nor do they mention the "use" of a property at all. Instead, they provide examples of residential properties that are limited to certain types of dwellings and land proximate to the dwellings and examples of properties that are not residential, <u>i.e.</u>, a commercial hotel, motel, inn, tourist camp, or tourist cabin. I.C. § 6-1.1-20.6-4;

11

I.C. § 6-1.1-20.6-2.5.  To harmonize this dissonance between the narrow statutory meanings and the constitutional norm, the Court must construe the disobedient statutory definitions based on a property's use.

When interpreting statutes, it has been long understood that "[a]ll laws come before [the courts] clothed with the presumption of constitutionality[.]"  Holcomb v. Bray, 187 N.E.3d 1268, 1277 (Ind. 2022); see also Sawlani v. Lake Cnty. Assessor, 240 N.E.3d 734, 737 (Ind Tax Ct. 2024), petition for review filed (Ind. Sept. 30, 2024).  Thus, the statutes at issue must be construed to give effect to the dictates of the Constitution. See State v. Katz, 179 N.E.3d 431, 443 (Ind. 2022) (stating that the interpretation of the Indiana Constitution is controlled by the text itself.); see also Sawlani, 240 N.E.3d 734, 738.

Accordingly, the Court holds that strict reliance on the statutory definitions of "residential property" and "nonresidential real property" is contrary to law because they identify certain properties that meet the constitutional use standard without fully accounting for other properties used for residential purposes that may qualify for the 2% or 3% tax cap.  Moreover, reliance on the text of the statutory definition of "nonresidential real property" is itself improper because Gary II's properties are not "undeveloped land," but they are improved land that is platted, has public utilities, paved roads, streets, and sidewalks.  2011 REAL PROPERTY ASSESSMENT GUIDELINES ("Guidelines") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011) (amended 2020)) Ch. 2 at 16.

Having determined the proper legal standard, the decisive question is no longer whether Gary II's properties qualify as "residential property" under the statutorily defined

safe harbors," but is whether the record evidence shows that Gary II's properties were used for residential purposes. Thus, the Court turns to the evidence.

## Evidence

The final determination found that Gary II did "not support[] its claim[s] with probative evidence[; thus, the Assessor's] duty to support the assessment[s] with substantial evidence [was] not triggered." (See, e.g., Cert. Admin. R. Vol. 1 at 296 ¶ 10(k) (citation omitted).) Accordingly, to prevail on appeal, Gary II must demonstrate that it made a prima facie case by presenting probative evidence that its properties were used for residential purposes. See Wigwam Holdings LLC v. Madison Cnty. Assessor, 125 N.E.3d 7, 12 (Ind. Tax Ct. 2019).

> Properly understood, the term prima facie case is a convenient shorthand for describing situations where the taxpayer has chosen or is required to offer evidence of a competing view of an assessment to demonstrate the invalidity of [an Indiana] Board final determination. Once the taxpayer has made the proper evidentiary showing, it is incumbent upon the [Indiana] Board to offer some explanation in order to rebut the taxpayer's evidence[in the final determination.] . . . The rule is simple: when a taxpayer offers probative evidence, that evidence must be dealt with in some meaningful manner. The prima facie case formulation allows this Court to determine whether the [Indiana] Board did so.

Clark, 694 N.E.2d at 1234–35 (emphasis added).

Probative evidence is evidence that tends to prove or disprove a material fact. See Tipton Cnty. Health Care Found., Inc. v. Tipton Cnty. Assessor, 961 N.E.2d 1048, 1051 n.3 (Ind. Tax Ct. 2012). Moreover, because it is evidence that is sufficient to establish a given fact, it remains sufficient to establish that fact if it is not rebutted. See

13

Wigwam Holdings, 125 N.E.3d at 12.

Gary II presented all five Property Record Cards (PRCs)[7] as evidence that the Assessor classified all the properties as "residential" for purposes of assessment under the 2011 Real Property Assessment Manual and the 2011 Real Property Assessment Guidelines. See REAL PROPERTY ASSESSMENT MANUAL FOR 2011 ("Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011) (amended 2020)) at 17 (emphasis added); see also Guidelines. On each PRC, the Assessor listed under "General Information" the designations "Property Class 500" and "Vacant – Platted Land." (See, e.g., Cert. Admin. R. Vol. 1 at 24.) The tables in Appendix A of the Manual explain the Property Class 5 and Subclass 00 codes. See Manual at 16-19. "Class Code 5" is described as "Residential taxable land and improvements used primarily for residential purposes[,]" as distinct from seven other property classes such as "Class Code 1" ("Agricultural taxable land and improvements used primarily for agricultural purposes"); "Class Code 3" ("Industrial taxable land and improvements used for primarily for manufacturing, processing, or refining foods and materials"); and "Class Code 4 ("Commercial taxable land and improvements used for general commercial and recreational purposes"). Manual at 16 (emphases added). More specifically, Class Code 5 indicates that its Subclass 00 designation is a "[v]acant platted lot." Manual at 17.

Under the heading "Location Information," Gary II's PRCs include information

---

[7] A property record card is "[a] document specially designated to record and process specified property data. It may serve as a source document, a processing form, or a permanent property record." 2011 REAL PROPERTY ASSESSMENT GUIDELINES (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011) (amended 2020)), Glossary at 18.

14

about the property's County, Township, District 004, School Corporation, Neighborhood, Address, and Market Model. (See, e.g., Cert. Admin. R. Vol. 1 at 24.) "All property within a jurisdiction must be established as part of a neighborhood defined by the assessing official[,]" based on multiple factors, such as common development characteristics, lot size, subdivision plats and zoning maps, school and other taxing district boundaries, and distinctive geographic boundaries. See Guidelines, Ch. 2 at 7-8. The "Neighborhood" category has a "code number assigned by the jurisdiction assessor to the parcel's location." Guidelines, Ch. 2 at 18. The neighborhood code numbers in this case are "Neighborhood 2534-004" for one property and "Neighborhood 2536-004" for the other four properties. (See Cert. Admin. R. Vols. 1 to 5 at 24.) The code numbers then appear under the "Market Model" category next to the property's classification, which each of the PRCs lists as "Residential." (See Cert. Admin. R. Vols. 1 to 5 at 24.)

"The basis for classification is the predominant current use." Guidelines, Ch. 2 at 18 (emphasis added). Indeed, the Guidelines require a property's classification to reflect the "majority use as residential, agricultural homesite, commercial, or industrial." Guidelines, Ch. 2 at 8 (emphasis added). Here, Gary II's properties are all classified as "Residential." (See Cert. Admin. R. Vol. 1 to 5 at 24.) For purposes of assessment, therefore, the Assessor has classified Gary II's properties as located in neighborhoods where the majority use is residential.

Under the heading "Characteristics" on the PRCs are the subheadings: "Topography," Public Utilities," "Streets or Roads," and "Neighborhood Life Cycle Stage." (See, e.g., Cert. Admin. R. Vol. 1 at 24.) The properties at issue all list having "level"

topography (approximately at street level and relatively flat), all public utilities available, paved streets or roads and sidewalks (with one exception)[8], and were in a static neighborhood life cycle stage ("[a] condition of equilibrium evidenced by little change"). (See, e.g., Cert. Admin. R. Vol. 1 at 24.) See also, e.g., Guidelines, Ch. 2 at 16, 23-24. These improvements and conditions, in conjunction with the entries on the PRCs under "Location Information" discussed above, are consistent with residential use.

Finally, there is a table titled "Valuation Records (Work In Progress values are not certified values and are subject to change)" on the PRCs that calculates the property's assessed value. (See Cert. Admin. R. Vol. 1 at 27 (Parcel 1 Tax Record); Cert. Admin. R. Vol. 1 at 24 (Parcel 1 PRC). Within this table, the property's classification and associated tax cap percentage is indicated by the placement of the assessed value of land and/or improvements directly across from the assigned classification and percentage; for example, "Land Res (1)," "Land Non Res (2)," "Land Non Res (3)," "Imp Res (1)," "Imp Non Res (2)," and Imp Non Res (3)." (See, e.g., Cert. Admin. R. Vol. 1 at 24.) The placement of the assessed value of Gary II's properties under "Valuation Records" on the "Land Non Res (3)" line is the only indication of a different classification than "residential" on Gary II's PRCs. (See Cert. Admin. R. Vols. 1 to 5 at 24.) Although this appears to indicate that standards for determining classifications for assessment purposes differ from those for determining classifications for purposes of tax caps, no evidence or argument supports this postulate.

As seen in both the Manual and the Guidelines, the assessment of property reflected on a PRC is largely founded on use, which is consistent with the constitutional

---

[8] The property record card for Parcel 2 does not note whether it has sidewalks. (See Cert. Admin. R. Vol. 2 at 24.)

standard for determining tax cap classifications. (See Guidelines, Ch. 2 at 8, 16, 18; see also Manual at 16.) There are no statutory provisions that provide a specific method for determining classifications for tax cap purposes. Therefore, it is reasonable to conclude that the standards for assessments and tax cap classifications contained in the Manual and Guidelines, which are consistent with the constitutional standard for tax cap classification, should correspond.

In addition to the PRCs, Gary II presented five GIS maps, which are aerial photographs of each property that reveal visually that they are located in platted neighborhoods that have roads winding through a mixture of vacant lots scattered among improvements that appear to the naked eye like residential dwellings, not commercial, industrial, or agricultural improvements. (See, e.g., Cert. Admin. R. Vol. 1 at 28.) Together with the information under the "Notes" heading on the PRCs, which indicate that two of the properties at issue had dwellings at one time that were burnt out or demolished and removed in 2014 and 2015 respectively, all reasonable inferences necessarily point to residential use. (See Cert. Admin. R. Vol. 1 at 24 (Parcel 1); Cert. Admin. R. Vol. 5 at 24 (Parcel 5).)

The Indiana Board framed Gary II's argument that its properties were entitled to the 2% tax cap as solely based on the evidence that its platted lots were zoned residential. (See, e.g., Cert. Admin. R. Vol. 1 at 295-96 ¶ (10)(h)-(j).) Not only is this blind to the wealth of evidence Gary II submitted, but it also ignores the authority in the Guidelines that states "[r]esidential land is land that is utilized or zoned for residential purposes." Guidelines, Ch. 2 at 53 (emphasis omitted). Moreover, the Guidelines explain that "property classification and pricing method [is] determined by the property's

17

use or zoning." Guidelines, Ch. 2 at 53. The importance of zoning as evidence of residential use is validated by its purpose. "The ultimate purpose of zoning regulations is to confine certain classes of uses and structures to certain areas. Thus, it is proper for a municipal authority to designate certain areas as 'residential' and to restrict [other] uses[.]" Metropolitan Bd. of Zoning Appeals, Div. II, Marion Cnty. v. Gunn, 477 N.E.2d 289, 299 (Ind. App. 1985) (citations and internal brackets omitted). To use property for any other purpose than its zoning prescribes is enforceable against a non-conforming use. See Hannon v. Metropolitan Dev. Comm'n of Marion Cnty., 685 N.E.2d 1075, 1082 (Ind. App. 1997). Therefore, the zoning of Gary II's properties, while not dispositive, serves as additional evidence that supports its claim of residential use. See Guidelines, Ch. 2 at 53; see also Southern Indiana Gas & Elec. Co. v. Riley, 299 N.E.2d 173, 174 (Ind. 1973) (considering zoning for future use as probative valuation evidence).

The Indiana Board found that Gary II did not support its claim with probative evidence. (See, e.g., Cert. Admin. R. Vol. 1 at 293-96 ¶ (10)(k).) The Indiana Board, however, did not deal with Gary II's evidence in a meaningful manner, because it failed to analyze the array of evidence Gary II submitted. See Clark, 694 N.E.2d at 1234-35. The final determinations are, therefore, devoid of any reasoning that supports the Indiana Board's conclusion that Gary II's evidence was not probative.

"Probative evidence is evidence that tends to prove" a material fact. Champlin Realty Co. v. State Bd. of Tax Comm'rs, 745 N.E.2d 928, 934 (Ind. Tax Ct. 2001) (citation omitted), review denied. The material facts here were those relevant to whether the properties were entitled to be classified as "residential" for tax cap purposes. Upon review, the Court finds that the totality of Gary II's evidence is

18

probative because it tends to prove the material fact that its properties, as they stood on the 2017 assessment date, were used for residential purposes.

The Court further finds that Gary II's probative evidence made a prima facie case that its properties are used for residential purposes. See U-Haul Co. of Indiana Inc. v. Indiana Dep't of State Revenue, 896 N.E.2d 1253, 1256 n.4 (Ind. Tax Ct. 2008) (stating that "[p]rima facie means at first sight, on the first appearance; on the face of it; so far as can be judged from the first disclosure; presumably; a fact presumed to be true unless disproved by some evidence to the contrary") (emphasis added and citations omitted). Thus, the evidentiary burden shifted to the Assessor to provide substantial evidence to rebut Gary II's probative evidence.  See Clark, 694 N.E.2d 1230, 1233.

The Assessor provided no evidence.  Instead, she merely made conclusory statements that Gary II's evidence was not sufficient to overcome the assessment's presumption of correctness.  (See, e.g., Cert. Admin. R. Vol. 1 at 318-19.)  In addition, she stated that Gary II "managed to put forth evidence which more readily shows that it is not entitled to the 2% [tax cap]."  (Resp't Br. at 2.)  Because the Assessor offered no contrary evidence and scant argument before the Indiana Board and the Court, Gary II's prima facie case remains sufficient to meet its burden of proof.  Tipton Cnty. Health Care Found., 961 N.E.2d at 1051.  "'If the [Indiana] Board fails to make any findings as to evidence rebutting the taxpayer's prima facie case, or enters unsupported conclusions or findings, the [Indiana] Board's decision will be reversed.'" Inland Steel Co. v. State Bd. of Tax Comm'rs, 739 N.E.2d 201, 212 (Ind. Tax Ct. 1998) (citation omitted and emphasis added), review denied.

19

**CONCLUSION**

Consequently, the Court AFFIRMS the Indiana Board's finding regarding the base rates applied to Gary II's properties. In addition, the Court holds that the statutes defining tax cap classifications must be applied based on a property's use to be consistent with the Indiana Constitution. The Court further holds that each of Gary II's five properties was qualified in 2017 for the residential tax cap classification. Accordingly, the Court REVERSES and REMANDS the case to the Indiana Board to order the Assessor to apply the 2% tax cap to Gary II's 2017 five properties' assessed values consistent with the Court's findings in this case.